# Hart *against* Gregg.

A mere entry by one co-heir into the land of the ancestor, claiming it all and taking the rents and profits for 21 years, is no disseisin of the other heirs; to make it such there must be some plain, decisive and unequivocal act or conduct on the part of the heir so entering, amounting to an adverse and wrongful possession in himself, and disseisin of the others.

If such coheir enters and keeps possession, leases the property, receiving the rents, and erects fences and buildings adapted to the cultivation and profit of the property, without denying possession to the others, or turning them out, but on the contrary takes out a patent 8 years after his entry, expressly in trust for himself and the other heirs of his father, and the lands are taxed in the name of his father for 15 years afterwards, such entry and possession, though held for more than 21 years, are not a disseisin of the other heirs.

Even where the record of a deed is improperly admitted in evidence, it is cured by the subsequent production of the deed itself.

THIS was a writ of error to the district court of *Allegheny* county, on a judgment rendered in that court in favour of the plaintiffs, in an ejectment brought by Oliver O. Gregg and Christian Johnson, plaintiffs below and defendants in error against Jacob Hart, the defendant below, and plaintiff in error. It was brought on the 20th November 1838, to recover the undivided third part of a tract of land adjoining the borough of Birmingham, containing 81 acres. This tract was part of a larger tract which had belonged to John Ormsby, deceased, and was called for distinction, the Triangle. The plaintiffs claimed as alienees of Gabriel Swazey and Mary his wife, who was alleged to be the daughter of John Ormsby, Jun., deceased, one of the sons of John Ormsby, Sen., deceased. The defendants claimed under the heirs of Oliver Ormsby, deceased, another of the sons of John Ormsby, Sen., deceased. It was admitted that John Ormsby, Sen., died on the 9th December 1805, and his wife Jane died in the year 1791; that John their eldest child was born in 1765, and died in August 1795; Oliver, another son, was born in 1767, and died in 1832. Jane (afterwards Mrs Bedford) was born in 1769, and died in the year 1790, without issue. Joseph B. died in 1803. Sidney, another daughter, was born in 1774, and was alive at the time of the trial.

On the trial in the court below, the plaintiffs gave in evidence a patent to Oliver Ormsby, for 345 acres and allowance, dated April 16th 1813, consideration money 276 dollars 78 cents, reciting that said tract was surveyed in pursuance of application No. 1, entered April 1st 1769, by John Ormsby, who since died intestate, leaving issue the said Oliver, and several others to survive him, to whom the above described tract of land descended, &c. The patent was

to the said Oliver Ormsby for himself, and in trust for the other heirs of John Ormsby, deceased, a certain tract of land called Ormsby's villa, &c.

To prove the pedigree of Mary Swazey, as the daughter of John Ormsby, Jun., and the marriage of John Ormsby and Lydia Swazey (the mother of Mary) at Homochitto, in Mississippi, the plaintiffs read in evidence a number of depositions, which it is unnecessary now to detail the contents of, and several letters, viz., January 1st 1789, John Ormsby Sen. to John Ormsby, Jun.; July 1791, Buffalo, John Ormsby, Jun , to Nathan Swazey; July 1791. John Ormsby, .Jun., to Lydia Ormsby; March 12th 1825, Oliver Ormsby to Mary Swazey; March 19th 1828, Oliver Ormsby to Mary Swazey.

The plaintiffs then offered a copy of a deed from Gabriel Swazey and wife to the plaintiffs, from the records of the recorder of deeds of Allegheny county, duly recorded in his office. The defendants ·objected, that this was but a copy, and that the grantees were con-'fessedly in possession of the original deed. The court overruled the objection, and at the defendant's instance sealed a bill of exceptions. The defendants afterwards objected that the acknowledgment was not before any mayor, chief magistrate or officer, as required by law, nor legally certified. But the court were of opinion that these objections were not founded on fact or law, and again sealed a bill of exceptions. It appeared, however, that the original deed was not then in court, but after the record was read, .it was produced and handed to the defendant.

The plaintiffs then gave in evidence the assessment books of St. Clair township, from 1800 to 1819 inclusive, to show the lands formerly of John Ormsby, Sen., which had continued to be taxed in the names of his heirs generally.

The defendant denied the marriage of John Ormsby, Jun., to the mother of Mary Swazey, under whose conveyance the plaintiffs .claimed. They further contended that John Ormsby, Jun., had been advanced by his father, John Ormsby, Sen.; and also insisted that Oliver Ormsby having had the exclusive possession and enjoyment of the premises was protected by the statute of limitations.

The defendant gave in evidence a deed, dated December 1st 1804, from John Ormsby, Sen., to Isaac Gregg and Sidney Gregg, ·(his daughter,) for 50 acres, a portion of the above mentioned tract of 345 acres, and not now in dispute. Also a deed dated July 23d 1804, from John Ormsby, Sen., to Oliver Ormsby, for 200 acres and allowance, another portion of the same tract in consideration of 4000 dollars. Also letters of May 20th 1789, and August 9th 1773, from John Ormsby, Jun., to John Ormsby, Sen. Also a deed, made in 1804, from John Ormsby, Sen., to Dr. Nathaniel Bedford (who married one of his daughters), for 75 acres and ·allowance, another part of said tract.

To show the advancement, the defendant gave in evidence the ledger of John Ormsby, Sen., under date, commencing January

10th 1786, and containing his account with John Ormsby, Jun., in which he charged him with various items of cash, paid to and for his son John Ormsby, Jun., amounting to 600 pounds, and closed by giving him credit for 600 pounds, cash received from Culbertson. To this was annexed a *nota bene*, that the design of keeping the above account was a memorandum of the different payments which he had made on his son John's account. The defendant then gave in evidence a deed dated October 26th 1786, from John Ormsby, Jun., to Jane Ormsby (his mother), in consideration of 5 shillings, and for other valuable considerations, in fee simple, for 269 acres and allowance, situate on the river Monongahela, with general warranty: and a deed dated June 24th 1793, from John Ormsby, Sen., and the said Jane Ormsby his wife, to Robert Culbertson for this tract reciting a re-survey in 1791, by which the tract contained 324 acres, in consideration of 600 pounds, with general warranty. The defendant contended that the 600 pounds for which his father gave credit to John Ormsby, Jun., in his account, was a gift to him of that money: and that John must still be considered as advanced this 600 pounds. The plaintiffs, on the contrary, insisted, that the father had received that amount from the land of John, which John had conveyed to his mother as his trustee, and that the father's advance of the 600 pounds was thus paid and at an end.

The defendant further gave in evidence the book of Oliver Ormsby, containing a list of his lands, made out however as late as June 1832, containing, among others, about 250 acres east of Birmingham.

The defendant also gave in evidence the petition of Oliver Ormsby to the orphans court, in August 1816, for a partition, which was not proceeded in.

The plaintiffs then, to show that Oliver Ormsby did not hold or claim the land now in dispute adversely to the other heirs of his father, offered the administration bond of Oliver Ormsby, in connection with testimony that no administration accounts had ever been filed, and that in those times no copies were kept, or memoranda made of granting letters of administration other than filing the bond. The defendant objected that it was irrelevant; the plaintiffs answered that they offered this as rebutting evidence on the subject of advancement and hotchpot, and also to account for Oliver Ormsby's going into possession and taking the rents, as it was a common error throughout the whole country, that the administrator or executor had a right to the rents of the deceased. The court overruled the objection and sealed a bill of exceptions.

The administration bond of Oliver Ormsby, as administrator of his father's estate was then read, and the plaintiffs called John M. Snowden as a witness to prove his certificate of the 23d October 1830, as register of the county, to be correct. It certified that he had made lawful search, and was not able to find any inventory

[Hart v. Gregg.]

or ·account of Oliver Ormsby. He stated that in early days no minutes were made of issuing letters of administration, but the bond only was filed, till the year 1816: since that time minutes had been made of their issuing.

A. patent dated March 5th 1800, was issued to Oliver Ormsby for 294 acres, called Mount Oliver, 59 pounds 6 pence, " now paid." This was surveyed in pursuance of an application in the name of Oliver Ormsby, April 1st 1769. The plaintiff contended that Oliver Ormsby being an infant when this application was made, his father was the real applicant, and the land was an advancement to Oliver. In addition, connected surveys of the Ormsby property, three tracts surveyed in the names of John Ormsby, Sen., John Ormsby, Jun., and Oliver Ormsby, were produced.

There was further shown a record of an ejectment at November term 1838, for 300 acres (a different tract from the present) brought by Oliver Ormsby Gregg and Christian Johnson against Aaron Watson. Another by the same plaintiffs against Elias Phillips and others for coal hill lots, 61 to 79 inclusive, and 35 acres adjoining. These lands had belonged to John Ormsby, Sen., who died seised, and the plaintiffs claimed under Mary his daughter, and the defendants as heirs of Oliver Ormsby.

A great deal of parol evidence was given to show the occupancy and enjoyment of the premises by Oliver Ormsby, after the death of· his father, by cutting wood upon it, renting it to tenants, and receiving the rents, the placing of buildings upon it by the tenants, ·their taking out coal, and its being claimed *as his and passing as such,* the material parts of which are stated in the charge of the court.

*Grier,* president, delivered the same charge to the jury as in the case of Philips *v.* Gregg, *ante,* 158.

*Dunlop* and *Shaler,* for plaintiff in error. 1. The court erred in allowing the record of the deed to be read, when the original deed was required by the defendant. In Vickory *v.* Knight, 4 *Binn.* 212, it is questioned by Brackenridge, J., whether on notice to produce the originals, recorded copies of deeds can be given in evidence in any case until the non-production is accounted for. But notice not having been given in that case, *it ·was thought by him ·it would be taking the party by surprise to insist upon it.* This case is referred to by Kennedy, J., in Kern *v.* Swope, 2 *Watts* 79, who cites Lessee of Talbot *v.* Simpson, 1 *Pet. C. C. Rep.* 188, where it was held that the registry is but *prima facie* evidence that the original had been legally proved.

2. On the subject of advancement they referred to their arguments in the former cases, relative to the Ormsby property.

3. We alleged Oliver entered after his father's death on the triangle as well as the rest of the property. He cleared, changed the fences, put ·up a house, and claimed and held it as his own for more than

21 years. The principles of the charge on this head, and answers of the court are incorrect, particularly the answer to the plaintiff's third point.

*M' Candless* and *Metcalf,* for defendant in error.

The opinion of the court was delivered by

SERGEANT, J.—The only point in this case which distinguishes it from those already decided in the other cases, arises upon the statute of limitations. The defendant insisted, that the circumstances proved in the cause, were of such a nature, as that in point of law, the jury were bound to presume an actual ouster of the plaintiff by Oliver Ormsby. The court below refused to give this binding instruction to the jury, but left it to them to decide, as a matter of fact upon the evidence; and this leads to an investigation of the origin and grounds of the law on this subject, and of the principles settled in respect to it.

Littleton in his tenures, and Lord Coke in his Commentaries on Littleton, are perhaps sufficient to show us how the law existed in their days, and has been handed down to us. Littleton in *sect.* 396, says, if a man seised of land in fee, have issue two sons, and die seised, and the youngest son enter by abatement into the land, and hath issue, and dieth seised, and the land descend to his heir, and the issue enters, in this case, the eldest son and heir may enter by the law upon the issue of the younger son, notwithstanding the descent; because, that when the youngest son abated before any entry by the youngest son, *the law intends,* that he entered claiming as heir to his father; and for that the eldest son claims by *the same title,* that is to say, is heir to his father, he and his heirs may enter. But, (he says in *sect.* 397,) the case is different if the eldest son enter and is seised, and after the youngest son *disseiseth him,* because the youngest son cometh to the lands by *wrongful disseisin* done to his eldest brother, and is like a stranger. In *sect.* 398, he puts the case of coparceners. In the same manner, if a man seised of land has issue, two daughters; and dieth, the eldest daughter enters into the lands *claiming all to her* and thereof *solely taketh the profits,* and has issue and dies seised by which her issue enter, &c., yet the younger daughter or her issue, as to the moiety, may enter upon any issue of her elder daughter, *for that they claim by one same title.* So in *note* 175, by Lord Nottingham to *Co. Lit.* one coparcener cannot be disseised without actual ouster, and claim shall not alter the possession.

According then to these, the highest authorities in the land, the entry by one coparcener into the whole, claiming it all and taking the rents and profits of the whole to herself, is no disseisin, or at any rate if it is so at all, can only be at the election of the disseisee. There must be something more—there must be some plain, decisive and unequivocal act or conduct on the part of the coparcener who

X.—R

enters, amounting to an adverse and wrongful possession in herself and disseisin of her companion. Several cases of this kind are put by Lord Coke, and may be infinitely varied in each particular case. "Thus," he says, "if both sisters had entered after the death of their father and were seised, and then the eldest disseised the younger of her part, and was thereof seised in fee, and hath issue, the younger nor her heir cannot enter. *Co. Lit.* 242. So if one coparcener enter claiming the whole, *make a feoffment in fee,* and taketh back an estate to her and her heirs, and has issue and dies seised, this descent takes away the entry, because by the feoffment the privity of the coparcenary is destroyed.

That the same rule applies with equal force to joint tenants and tenants in common; viz, that the entry of one shall generally be taken as an entry for his companion as well as himself, is every where admitted. Children taking by descent under our laws as statutory heirs, though they hold as tenants in common, yet are in many respects in the nature of coparceners, and they take, like coparceners, by one and the same title; and there is a similar privity of estate between them, to destroy which a disseisin must be made by any one entering as heirs.

The modern cases, generally speaking, have conformed to the principles laid down by Littleton and Coke. In Reading's case, *Salk.* 392, it is said, that between tenants in common there must be an actual disseisin, as turning him out, hindering him to enter, &c. and a bare perception of profits is not enough. In Fairclaim *v.* Shochleton, 5 *Burr.* 2604, it was decided, that a perception of profits by one tenant in common alone without account, is no actual ouster—there must be an actual disseisin proved. It is true, that in Doe *v.* Prosser, *Cowp.* 217, it is commonly stated to have been held, that uninterrupted possession by one tenant in common without account, and without adverse claim for 36 years, was a bar to his companion; but there the tenant in common held over in her own right, after a partition for the life of her husband, and Lord Mansfield puts the case on the ground of a holding over after the particular estate was ended. Besides which, the jury found an actual ouster by presumption from the facts proved. Peaceable *v.* Read, 1 *East* 568, was a strong case; there a female tenant in common died, after having made an appointment of her share. The other claiming under a later instrument, made when she was insane, levied a fine soon after her death, of the whole, and received all the rents and profits for nearly five years without account. Yet this was held no ouster, and that *some act* to that effect must be shown. Such an act appeared in the case of Doe *v.* Bird, 11 *East* 219, where it was decided that one tenant in common in possession claiming the whole, and *denying possession* to the other, is something beyond the mere receiving of rents, which is equivocal, and was evidence of an ouster. So in Lodge *v.* Patterson, 3 *Watts,* 74, the one brother put up the other's share at

[Hart v. Gregg.]

public vendue and became the purchaser himself, and held and occupied for 21 years and more under it.

. It thus appears that if Oliver Ormsby had desired to disseise his. brother and sister, or either of them, and gain the exclusive and adverse possession for himself, it was easy for him to do so by various acts, of the design and effect of which, in point of law, there could have been no mistake. If he has not chosen to do so, we would not be obliged to impute to him, either while living, or now since his decease, a tortious and unjust proceeding, which he himself declined to adopt. The law rather considers him as faithful to the interests of those, so nearly related to him by blood, and as not willing to destroy the privity of estate existing among brothers and sisters, holding under a common parent, by inheritance. In the inequalities of age, and separations of residence, which continually occur among us, on the descent of lands of inheritance to all the children equally, it must often happen, that one is placed in a position in which the care and preservation of the common property is thrown upon him, and a duty imposed, as well by regard for deceased parents, as by those intimate ties and feelings that connect together one family, and this duty is often cheerfully encountered. To throw it off, to attempt to deprive those so near, of their equal share of the inheritance of their parent, is not a design which every man would deem just and honourable, or desire to have imputed to him; for however it may have been in the earlier ages of the English law, for reasons not now, perhaps, well understood, yet now-a-days, titles gained from co-heirs by disseisin, are not much in accordance with our notions of justice and morals; especially among children of the same family as against each other. The law, therefore, recognizes one entering as co-heir or co-tenant, as bailiff, trustee, or receiver for the others: equity allows him all charges incurred in the care and reasonable improvement of the property for the common benefit, and the statute of Anne gives the others an action of account render against him, for the share of the rents and profits which he ought to pay over.

In looking at the case before us, we are at a loss to discover any act or course of conduct on the part of O. Ormsby, amounting in law to a disseisin of his brother and sister. He never turned them out, nor denied them possession. He never created a new title in himself or any other person under which possession was held. He never in point of law, threw off the relation of brother and co-heir to assume the position of a stranger. All he did was to enter and keep the possession, lease the property, and receive the rents, erecting fences and buildings, adapted to its cultivation and profit. He does not seem even to have claimed it as his own, though even that alone though accompanied with the receipt of the rents and profits, would not, according to many authorities, be an ouster. On the contrary he took out a patent in 1813, expressly in trust for himself and the other heirs of his father—and the lands were taxed in the name of

the heirs until 1820. So far as we can judge of his intentions by the evidence, there is nothing to justify the belief that he intended to claim or hold against his brother and sister: and even if there were, there is no evidence of any act or proceeding amounting to a disseisin of his brother John Ormsby, or his heir under whom the plaintiffs claim.

As to the other points raised in this case of the advancement and marriage, I refer to the opinion of the court delivered at this term, by Mr Justice Rogers, in the other Ormsby cases.

There is nothing in the bill of exceptions. The defect in the evidence (if any existed) was cured by the production of the deed itself immediately afterwards.

Judgment affirmed,