[No. 33414. Department One. September 6, 1956.]

SUSIE FAUBION, *Respondent*, v. COLE C. ELDER *et al.,*
*Appellants.*[1]

*Washington & Wickwire,* for appellants.

*A. O. Colburn,* for respondent.

[1]Reported in 301 P. (2d) 153.

DONWORTH, C. J.—This is an action to quiet title to a strip of land containing approximately 4.5 acres located along the boundary between the southwest and the southeast quarters of a section of farm land located near Hartline.

Plaintiff alleged that the boundary had become lost and sought to have the true boundary established by a commission appointed by the trial court for that purpose. Defendants' affirmative defense and cross-complaint asserted title by reason of adverse possession. The trial court found that the boundary had become lost and that adverse possession was not established by defendants. The judgment and decree provided that a commission, appointed by the court, should survey, erect, and properly establish the boundary line between the two quarter sections in accordance with RCW 58.04.020 *et seq.* Defendants have appealed.

For convenience, we shall refer to defendant Cole C. Elder as sole appellant.

The material facts are not in substantial dispute and may be summarized as follows:

Arthur Elliott, respondent's father, purchased all of section 36, township 25 north, range 29 E.W.M. from the state about 1903. Shortly thereafter, he erected, north and south, a fence which divided the section into two fields. Sometime later, an east and west fence was erected. These two fences divided the section substantially into four parts, which were apparently intended to be quarter sections. There was no testimony to the effect that a survey had ever been made of these quarter sections to establish the true boundary between them.

Respondent testified that the north-south fence was rebuilt by her father in 1916, and had remained on the same line continuously until 1953. She also stated that her father originally built the fence for pasturing livestock and for convenience in farming.

Arthur Elliott died in January, 1937, and by the terms of his will he devised the southwest quarter to his son, Bert Elliott, and the southeast quarter to his daughter, respondent herein. Bert Elliott was appointed executor of the

estate, and he leased the entire south half of the section to appellant.

In 1938, appellant took a crop off the southeast quarter and paid the landlord's share to respondent, since that quarter had been distributed to her by the decree of distribution entered in March, 1938. Respondent received from appellant the landlord's share of all crops harvested east of the fence. Appellant did not farm the southeast quarter after 1938, but he continued to farm the southwest quarter as tenant of Bert Elliott until 1949.

In that year, Bert Elliott died and by his will devised an undivided one-half interest in the southwest quarter to his wife, and an undivided one quarter to each of his daughters, Phyllis Purvines and Juanita Cunningham. These heirs divided the property in 1949, with Mrs. Purvines acquiring a deed to the east half of the east half of the southwest quarter, and Mrs. Cunningham acquiring a deed to the west half of the east half of the southwest quarter.

Appellant continued to farm the east half of the southwest quarter as tenant of Mrs. Purvines and Mrs. Cunningham until July, 1951, when he purchased the east half of the southwest quarter from the two daughters of Bert Elliott and has since that time held title thereto.

The only evidence as to the acreage of the two quarters was found in records of the U. S. government production and marketing administration which were used by the department of agriculture to determine the annual wheat allotment. These records, which were mailed to all parties concerned each year after about 1942, show that the southwest quarter contains about 165 acres and that the southeast quarter contains about 152 acres.

In the fall of 1952, respondent informed appellant that she questioned the fence as the true boundary between the southwest and southeast quarters, and that she was ordering a survey to be made to determine the boundary. In September, 1952, Hubert Marshall, a licensed surveyor, made a survey of the southeast quarter and the east half of the southwest quarter. He determined that the true boundary was seventy-four feet west of the fence which

divided the two quarters. Respondent caused a second survey to be made by Arthur H. Bentz, another licensed surveyor, in September, 1953, and his calculations placed the line 49.65 feet west of the fence at the north boundary of the two quarters, and 99.45 feet west of the fence at the south boundary. The disputed area totaled approximately 4.5 acres, according to these figures.

It should be noted that neither of these surveys started from any established government monument. The surveyors testified that no such monuments could be located in the vicinity of this property. Their surveys were based on an assumed point of beginning.

As a result of the first survey, a dispute arose between the parties, and in the spring of 1953, respondent caused the fence to be removed. However, appellant continued to farm the land up to a ridge which remained where the fence had been, until the commencement of this action.

The evidence clearly establishes that appellant had farmed the land on the southwest quarter up to the fence at all times since 1937, while he was tenant for Bert Elliott, while he was tenant for Phyllis Purvines, and during the three years that he owned the east half of the southwest quarter. During the entire period of his tenancy (about fourteen years), appellant paid the landlord's share of the crops to his respective landlords upon the basis that the fence was the boundary line between the two quarters. At no time prior to 1952 did respondent claim that the fence was not the boundary between the two quarters.

Appellant makes ten assignments of error which are directed to the findings of fact, conclusions of law, and entry of judgment. His first assignment of error is that the court erred in finding that there was not sufficient evidence to sustain appellant's claim of adverse possession. We quote the challenged portion of finding of fact No 6, as follows:

"The defendants' claim to said property is based on the ancient fence which it is claimed was an agreed boundary line between the quarter sections involved, also upon adverse possession. Neither of these claims has been proven by sufficient evidence."

The undisputed evidence as to the basis of appellant's asserted claim of adverse possession clearly preponderates against the quoted finding of fact. For reasons hereinafter stated, we are convinced that adverse possession was established.

Appellant contends that the case of *O'Brien v. Schultz,* 45 Wn. (2d) 769, 278 P. (2d) 322, is controlling in this case. We agree. The only material difference is that in the *O'Brien* case the true boundary was established by a survey which was based upon known monuments. Here, no monument was ever found, and the testimony is to the effect that there is no monument within several miles of the land in question. The trial court properly refused to accept either of the surveys made in this case as a true survey, since they did not start from a known point on the ground.

Based upon these facts, and for the purposes of this decision, we shall assume that the true line between the two quarter sections is somewhere between the fence line and a point to the west thereof. The question, then, is whether appellant has acquired title to the disputed area by adverse possession.

For a better understanding of the trial court's holding upon this question, we quote from its oral decision, as follows:

"It may be that [the fence] is what they thought was the boundary line, but it was by mistake. It was by mistake. There is no testimony, at least, that they were both aware that this wasn't a correct division of the property for any period of ten continuous years. There is no testimony in that, that I recall to that effect. Now, it is a mistaken belief in what the true boundary line was; and that being the case, it seems to me that the law is clear that all they own is what the deed calls for, since the boundary line they have been operating on as being the boundary line is in fact not the true boundary line. So all they have is what the deed calls for. . . . Now, insofar as adverse possession was concerned, I can't see that there was any adverse possession because there is nothing that would ever indicate that Bert Elliott ever intended to claim more than what his deed called for. There is no overt act or any notice to Mrs. Faubion that he intended to claim any more than what his deed called for. Here is the gist of this: The distribution of

the property between them was in equal amounts. It was a quarter section to each one, which was an equal amount. So that they necessarily proceeded under that belief and under that understanding insofar as the deed was concerned, with that understanding that that was the property they owned. I can't see how it could ever be said that Bert Elliott intended to assert title to any of the property in the south half that his deed did not call for. It may be true that he farmed more property than his deed called for, but it wasn't with the intention to claim any more land than his deed called for. . . . That being the case, in any event, as I see it, all Cole Elder is entitled to is what his deed called for. . . . The dispute is as to whether or not we are going to take the fence line as the true boundary line of the quarter. When we know that is not the true boundary line of the quarter, all we have to do is to take the boundary lines both of these parties accepted. Mr. Elder accepted the true boundary line on the west, and Mrs. Faubion has accepted the true boundary line on the east as the east section line on the east. All they have got to do is divide that in half and you have got your true boundary line. I think that Mr. Bentz, insofar as it could be determined, did just that. He divided the true boundary lines in half. . . ."

The reasons given by the trial court for rejecting appellant's claim of adverse possession are strikingly similar to those given by the trial court in the *O'Brien* case, *supra,* wherein this court quoted from the trial court's ruling on defendants' motion for dismissal.

In the instant case, the gist of the trial court's reasoning is (1) that the fence had been located in the wrong place as the result of a mistake; (2) that appellant had failed to prove that his landlord, Bert Elliott, had exercised any dominion over the disputed strip of land sufficient to show an intention to claim ownership of it from 1937 to 1949; and (3) that neither appellant nor his predecessors could claim more than their deeds described.

As to point (1), the fact that the fence was located where it was by mistake on the part of Arthur Elliott, would not preclude appellant from recovering in this action if appellant and his predecessors had openly and notoriously evinced the necessary intention to claim the land they were

using up to the fence. *O'Brien v. Schultz, supra; Taylor v. Talmadge,* 45 Wn. (2d) 144, 273 P. (2d) 506.

██ As to point (2), the *O'Brien* case clearly states the rules applicable herein as follows:

"In no decision has this court ever held that one who claims title by adverse possession must appear in court and testify that he knew he was using his neighbor's land and that he intended to claim it if his plot was not discovered before the statutory period had run.

"Courts have had considerable difficulty in determining 'intention' in adverse possession cases, because intention may be evidenced (1) by the *acts* of a party, or (2) by his *declarations.* See 97 A. L. R. 14-114. . . .

". . . In jurisdictions such as ours, the *acts* of the user most frequently control. If his *acts* clearly evince an intention to claim land as its owner, a general *declaration* by the user that he did not intend to claim another's land will not prove lack of intention.

"The testimony in the case at bar strongly indicates that the fence erected in about 1900 and the ridge created along the fence was recognized by all owners for more than forty years as the boundary line. From 1922 to 1945, the testimony shows that the ridge, and later the second fence, were used by both parties as the boundary, and that during that period appellant and his predecessors always farmed the disputed strip and took the crops from it.

"This is one of those cases in which it may be said that 'actions speak louder than words.' By exercising full dominion and control over the strip for more than twenty years, during which time they took the crops from the land, the appellant and his predecessors *clearly evinced their intention to claim the strip* as against the whole world, including the owner of the legal title. *Lindley v. Johnston,* 42 Wash. 257, 84 Pac. 822.

"The trial court held in point (5) that appellant could not acquire title by adverse possession through a tenant as agent. We held exactly to the contrary in *Foote v. Kearney,* 157 Wash. 681, 290 Pac. 226, in which we said:

" ' "What a man may do himself, in the matter of taking and holding possession of real estate, he may do by another." ' "

In the case at bar, the testimony clearly indicates that the fence erected about 1903 was recognized by all owners for more than fourteen years prior to 1952 as the boundary

line. During this fourteen-year period, appellant farmed the land to the fence and took the crops from it. He paid the landlord's share of the crops not only to Bert Elliott, but also to respondent (in 1938), upon the basis that the fence was the boundary. Respondent admitted that she never claimed an interest in the crops raised on the disputed strip and that she had only farmed her land up to the fence.

It is our opinion that appellant and his predecessors clearly evinced their intention to claim the strip as against the whole world, including the holder of the legal title, for more than the statutory period. The evidence, therefore, establishes appellant's claim to the disputed strip of land by adverse possession, entitling him to a decree quieting title to the strip of land.

As to point (3), it is apparent that appellant and his predecessors were claiming *more* land than their deeds described. It is sufficient to state that the description in the deeds will be held to include the land in dispute in this case, since, where there is privity between successive occupants holding adversely to the holder of the true title continuously, the successive periods of occupation may be united or tacked to each other to make up the time of adverse holding. *Naher v. Farmer,* 60 Wash. 600, 111 Pac. 768, and cases cited.

Respondent argues that there was no proof that appellant's predecessors held adversely to her, since prior to 1949 the respective quarter sections were owned by brother and sister. In support of this position, respondent cites the Pennsylvania case of *Hart v. Gregg,* 10 Watts 185, 36 Am. Dec. 166. The cited case involved an asserted claim of adverse possession by one cotenant against the other cotenants, his brothers and sisters. The court held against the plaintiff, who claimed under the cotenant, stating:

"Children taking by descent under our laws as statutory heirs, though they hold as tenants in common, yet are in many respects in the nature of coparceners, and they take, like coparceners, by one and the same title; and there is a similar privity of estate between them, to destroy which a disseisin must be made by any one entering as heirs."

The court then held that there had been a failure of proof, not that there could not be a disseisin by one relative against another.

In the case at bar, respondent and Bert Elliott had separate titles to their respective quarter sections and stood in the same position as strangers.

The judgment is reversed, with directions to dismiss respondent's action and to enter a decree quieting appellant's title to the disputed strip of land in accordance with the prayer of his cross-complaint.

SCHWELLENBACH, FINLEY, and OTT, JJ., concur.

---

October 24, 1956. Petition for rehearing denied.