Hubert AGERS and Ruth Agers, his wife, Appellants,

v.

William REYNOLDS and Francis Reynolds, his wife, Respondents.

No. 45745.

Supreme Court of Missouri, Division No. 1.

Nov. 12, 1957.

Thurman, Nixon & Blackwell, Earl R. Blackwell, Hillsboro, for appellants.

Dearing, Richeson & Weier, H. L. C. Weier, Hillsboro, for respondents.

COIL, Commissioner.

Mr. and Mrs. Hubert Agers, plaintiffs below, instituted an action to determine title to the west half of lot 11 in DeSoto, Missouri, and to eject defendants, William Reynolds and his wife, from a portion (about 32′ x 700′) thereof. Defendants' claim of title to that strip of land by adverse possession was sustained by the trial court.

The south boundary of lot 11 was highway NH which angled from the southeast to the northwest. As a result, the north-south distance at the west side of the lot was considerably less than the north-south distance on the east. Charles Seemel and wife acquired all of lot 11 in October 1940. Seemel instructed John Deeton, a carpenter, to divide the lot into four equal lots measured along the highway, i. e., each lot to have the same front footage along the highway. At the time, Seemel thought the highway ran straight and thus believed that, by so measuring, each lot would contain the same area (the north line of lot 11 was perpendicular to the east and west lines). Deeton, in accordance with Seemel's instructions, with the help of his son and by using a steel tape, divided the total east-west dis-

tance, measured about 4′ to 6′ north of NH highway, into four equal parts, and divided the total east-west distance measured along the north boundary of the lot into four equal parts. The lines joining the respective points so established formed the boundaries of the four lots. Deeton testified that he realized the highway did not run straight but thought by moving 4′ to 6′ to the north and measuring there, he would eliminate any discrepancy that inhered by reason of the angling highway. In any event, Deeton, upon dividing in the manner noted, set two-by-four stakes as markers at the four corners of each of the four lots so measured.

On February 1, 1943, the Seemels conveyed the west half of lot 11 to John Fusco and wife, and on August 16, 1943, the Seemels conveyed to Charles Wilson the west half of the east half of lot 11. On December 14, 1945, Wilson conveyed the west half of the east half of lot 11 to Harry Ritter and wife, and on February 17, 1949, Ritter and wife conveyed that same west half of the east half to Oscar Williams and wife. On July 12, 1951, Williams and wife conveyed to defendants Reynolds a plot of ground with a 50′ frontage, being the westernmost 50 feet of the west half of the east half of lot 11 as determined by Deeton's stakes. In the meantime, on April 22, 1950, the Fuscos, who, as noted, owned the west half of lot 11, conveyed it to plaintiffs Agers. None of the foregoing deeds contained any metes and bounds description.

Shortly prior to March 1955, plaintiffs had a survey made to determine the boundaries of the west half of lot 11. The surveyor testified that he determined the total area of lot 11 and took one half of that to determine the area of the west half and placed the dividing line at a place which would result in the west and east halves being equal. The east boundary line of the west half of lot 11, according to the survey, went through the west portion of defendants' house.

The 32′ x 700′ strip of land to which defendants claimed title was the easternmost

32 feet of the west half of lot 11 and, to discharge their burden to prove their title thereto by adverse possession, adduced the evidence which we shall now summarize.

We have heretofore mentioned that Deeton placed two-by-four stakes as markers at the respective corners of the four lots into which he divided lot 11 and the west boundary line of the 32′ strip claimed by defendants is formed by a line running between those corner stakes.

Charles Wilson, who, as noted, acquired the west half of the east half of lot 11 in August 1943, testified: that at the time he purchased, his grantor, Seemel, showed him the four stakes at the corners of the lot he was supposed to have received by the conveyance; that there was no fence on the west boundary line of that lot but that, after the purchase thereof, he installed a corner post at each of the four corners of his lot replacing the Deeton stakes; that they were cedar posts 8″ in diameter and 6′ long, extending about 4′ above the ground; that he erected in front of the lot he thought he had acquired (i. e., along the highway forming the south boundary), a 4′-high wire fence strung along cedar posts placed at regular intervals, the westernmost post being the corner post placed at the location indicated by Seemel as being the southwest corner of the lot, and it appears that such corner post was at the place which defendants claim is the south beginning point of the west boundary line of the 32′ strip. Wilson also said that at the time he acquired the lot, his neighbors on the west were the Fuscos who, as noted, had acquired the west half of lot 11 on February 1, 1943; that he told Fusco he was going to put in a corner post to which Fusco assented, and that Fusco was present when both the southwest and northwest corner posts (a north-south line between which forms the west boundary line of the 32′ area claimed by defendants) were put in; that at that time he suggested to Fusco that they put in a partnership wire division fence but that Fusco refused on the ground that it would cost too much.

Wilson conveyed the west half of the east half of lot 11 to the Ritters on December 14, 1945, and they, in turn, to the Williamses on February 17, 1949.

Oscar Williams testified that when he purchased the property the house now occupied by defendants was not in existence; that prior to his purchase he and Ritter examined the property and Ritter showed him the corner markers and that the southwest corner marker and the northwest corner marker were both in existence; that also on a line between those markers was a hog-wire fence placed there by Fusco, plaintiffs' grantor; that the fence posts of the hog-wire fence started about 150′ north of the highway and were in line with the two corner markers; that in 1949, just before Williams began to build the original part of the house which defendants now occupy, he checked the boundary lines with Deeton, the carpenter, who, as noted, had laid out the lots at Seemel's direction. Williams said that at that time he showed Fusco the line that Deeton had pointed out and that Fusco at that time said that he knew that was the division line. Williams then proceeded to begin the house and while it was in progress plaintiffs bought the property from the Fuscos. There was no driveway before the house was begun, and, in order to put in a driveway, Williams had three cedar posts removed which were in front of the property, the westernmost post being about 2′ west of the west edge of the driveway. The driveway constructed at the time the house was built had existed continuously to trial time.

Vester White testified that he helped Williams build the house and lived therein from October 1950 until June 1951; that he assisted in building the driveway and that there was a cedar post at the southwest corner which was about 3′ west of the west edge of the present driveway; that there were cedar posts all along the front of the house and that he had to take one out because it was in the middle of the entrance to the proposed driveway.

Defendant William Reynolds testified that at the time he purchased from his uncle, Oscar Williams, the plot described in the deed as a portion of the west half of the east half of lot 11 running along NH highway for a distance of 50′, he asked where the west boundary line was; that Williams pointed to a rock as the southwest corner marker and as the beginning point of the west boundary line which was about 15′ west of the west edge of the house. Under the rock was a square wooden peg and a steel rod which had been driven into the ground. That corner marker so pointed out by Williams is the one which defendants now claim is the southwest corner of, and the beginning point of the west boundary line of, the area to which they claim title by adverse possession. Reynolds also testified that shortly after defendants purchased the property, plaintiff Agers was constructing a house of some kind on a portion of the property to the west and, each of the parties desiring electricity, discussed the matter of where to have placed a proposed utility pole; as a result they agreed to have the pole placed on a line between the southwest and northwest corner markers on approximately the same line as the hog-wire fence posts were then located and which posts had been placed there by Fusco. At another time Agers and Reynolds were talking about a lake which Agers contemplated building on property which he owned and which was located north of the north ends of both Agers' and defendants' lots. Agers wondered whether the proposed lake might interfere with defendants' and Williams' property (immediately east of defendants') and, at that time, Williams showed Agers the cedar post which was at the northwest corner of the Reynolds property. Reynolds, in the meantime, had added two rooms and a bath to the north (extending slightly west) side of his house. And Reynolds said that Mr. Agers had never suggested a survey to him but that they did discuss a boundary fence and were going to put it on the line of the old one, i. e., the hog-wire fence. Defendants had used the driveway on the disputed strip ever since moving to the property and, after the present suit was filed, Reynolds erected a 2-strand wire fence along the claimed west boundary line to prevent plaintiffs from using and injuring that driveway by causing heavy trucks to haul building material over the driveway and thence to plaintiffs' land to the west.

Plaintiffs' evidence which bore upon the question of defendants' claimed adverse possession consisted in the main of the testimony of plaintiff Hubert Agers and plaintiffs' grantor, John Fusco. Mr. Agers testified that Fusco, his grantor, had told him there was no established line between the two properties; that he did see a hog-wire fence along the side of the hog pen and that Fusco had shown him that fence; that Reynolds had used the driveway to the west of the Reynolds house all the time he lived there; that he asked Reynolds to have a survey made before he, Reynolds, built the house but that Reynolds said he knew where the line was; that at the time he purchased from Fusco, no stakes or stones marking corners were in existence but the hog-wire fence was there; that the Reynolds house was built after plaintiffs bought the place and when Reynolds started to build (apparently. the addition of two rooms), he (Agers) asked Williams to help Reynolds have it surveyed so that they would know where the boundary line was but that Williams replied that he (Williams) knew where the lines were and could show him; and he showed Agers a line which was the same line to which defendants now claim; Williams said that such was the old established line but that statement meant nothing to Agers. Agers further testified that he did not recall any fence or fence posts in front of the Reynolds house.

Mr. Fusco testified that Williams owned the property to the east of him at the time he sold to Agers. He further said that at one time he and Wilson and a Mr. Moss, who owned part of original lot 11, talked about a survey but that Moss died shortly thereafter and they forgot about it. He

said there was never any line separating his property and that of Williams to the east. He did say, however, that he found a stake (apparently the stake at the southwest corner heretofore referred to) but that it was rotted and he lost track of it. He said that he did have a hog pen but did not know whether the fence for that hog pen was on the dividing line and that he did not know where the dividing line should have been.

■ The above summary of the evidence demonstrates rather clearly, we think, that defendants' claim of title by adverse possession was amply supported by convincing and, in the main, uncontroverted evidence. In the absence of anything in the record which causes us independently to doubt the credibility of the witnesses adducing defendants' testimony, we should and do defer to the trial court's finding thereon which necessarily was that those witnesses were credible.

Without again fully reviewing the evidence set forth heretofore, we point to that which seems to us decisive. Instant case was filed on March 17, 1955. Consequently, the 10-year period with which we are concerned was from March 17, 1945, to March 17, 1955. On March 17, 1945, Wilson owned the west half of the east half of lot 11 and Fusco owned the west half of lot 11. In other words, on that date, Fusco had the record title to the 32′ strip now in controversy and Wilson had the record title to the property adjoining on the east. Despite the fact, however, that Fusco had record title to the controverted strip, the testimony is clear that Wilson believed that the western line of the lot he had acquired ran between the corner markers which had theretofore been installed by Deeton at the instance of the former owner, Seemel, and thus believed that the west half of the east half of lot 11 included the 32′ strip. So believing, Wilson erected a cedar post at the southwest corner of that strip and erected a fence from that corner eastwardly along the front of what he believed was,

and was treating as, his property. Not only that, but Wilson told Fusco that he was going to erect the corner post in question and Fusco not only consented that he do so but was actually present when both the southwest and northwest corner posts were erected. And, at that time, Wilson suggested a division fence to run between those two corner posts but Fusco declined because he did not care to bear one half the cost of the wire. It is doubtless true that, as Fusco testified, he did not know where the division line between his and Wilson's property should be, although it would appear that Fusco at least acquiesced in Wilson's statement as to the correct location of the division line. Be that as it may, however, there can be no doubt of the fact that Fusco knew that Wilson, defendants' predecessor in title, *claimed to own* to the same western boundary line to which defendants now claim, and there can be no doubt that Wilson asserted and took actual, hostile, open, notorious, and exclusive possession of the land in dispute.

Thereafter the Ritters acquired the west half of the east half of lot 11 and held it from December 1945 until February 1949 when they conveyed to the Williamses. At the time Williams purchased, Ritter showed him the corner markers, the same ones Wilson had placed according to Deeton's measurements. It is also a reasonable inference that the front fence erected by Wilson was there during the time Ritter owned the property. Those circumstances support a further reasonable inference that Ritter thought he owned to, and claimed to own to, the same western boundary as had Wilson.

At the time Williams purchased from Ritter, Fusco was still the owner of the west half of lot 11; plaintiffs did not purchase until April 22, 1950. And, by the time Williams purchased, a hog-wire fence had been erected by Fusco on the line between the southwest and northwest corner markers. In late 1949 and in 1950 Williams built a house and built a driveway to the west thereof. Part of the house and all

the driveway was on the disputed 32′ strip. The western boundary to which defendants now claim is, as heretofore noted, two or three feet west of the west edge of the driveway. There is no exact testimony as to whether the driveway was completed before or shortly after plaintiffs acquired the west half of lot 11, but there can be no question about the fact that because of the existence of the driveway and its continuous use by Williams and then by defendants, plaintiffs had actual knowledge that defendants not only claimed but actually occupied and exclusively used the disputed strip. Some time between July 1951, when defendants acquired the house in its original form from Williams, and March 1955, defendants added two rooms and a bath, a portion of which addition extended westwardly beyond the west end of the original house and partially upon the disputed strip.

■ We are of the view that all of the essential elements of adverse possession were fully proved by defendants and that plaintiffs adduced no substantial evidence to refute defendants' claim. Plaintiffs' chief contention is that because the Ritters, who, as noted, owned the west half of the east half of lot 11 immediately prior to the Williamses and whose possession of the 32′ strip in question was necessary, in order for the defendants to have established the continuity of their possession for the 10-year period, did not testify in the case, defendants failed to prove that their possession was continuous for 10 years. That contention is without merit. We have stated heretofore that the testimony was that Ritter showed Williams the west line of the property he thought he was conveying; that it was the same west line as that which forms the west boundary of the 32′ strip which defendants claim in the instant case; and that the front fence was there during the time the Ritters had title. Ritter's act in so showing the west boundary to Williams and the fact of the front fence could have had no other meaning, at least in the absence of any contrary evidence, than to clearly point to the fact that Ritter also

had claimed to possess and had exercised open, notorious, and exclusive possession of the 32′ strip, as had his predecessor, Wilson. And the reasonableness of that inference becomes more certain when it is remembered that Wilson, Ritter's predecessor, and Fusco had agreed that the west edge of the 32′ strip did in fact represent the west boundary of Wilson's property.

■ Plaintiffs also contend that the defendants did not prove that their possession was hostile. It is true that the west boundary line which ran between the southwest and northwest corner markers installed by Deeton at Seemel's direction and replaced by Wilson, and the same line on which the hog-wire fence was erected by Fusco, was not in truth and in fact the true line separating the east and west halves of lot 11; and it is also true that that fact was unknown to both plaintiffs and defendants and their respective predecessors in title until the survey just prior to March 1955. To make defendants' possession hostile, however, it was only necessary that they and their predecessors in title intended to occupy and did occupy as owners the 32′ strip. And that is true, even though they did not at the time intend to take anything from the true owner and did not at the time intend to occupy or possess land to which they had no record title. In State ex rel. Edie v. Shain, 348 Mo. 119, 123, 152 S.W.2d 174, 176, this court quoted from its prior case of Bell v. Barrett, Mo., 76 S.W.2d 394, 396, as follows: " 'In determining the character of the possession, the important factor is, not whether the true line is known or whether there is a mistake as to the boundary, since the location of a fence beyond the true boundary line is usually due to mistake, but it is the intent with which the boundary fence is built and the unequivocal character of the claim made thereafter, which is decisive of the question. It is not necessary that the rights of the true owner be definitely known before an unequivocal claim can be made against his rights. * * *'" And the court then said: "The principle, as stated in all of our

prior decisions, may be reduced to this: If the possessor occupies the land in question intending to occupy that particular piece as his own, his occupancy is adverse. It is not necessary that he intend to take away from the true owner something which he knows belongs to another, or even that he be indifferent as to the facts of the legal title. It is the intent to possess, and not the intent to take irrespective of his right, which governs. Possession is a legal concept. It involves two things: A present or, in the case of constructive possession, a past ability to control the thing possessed plus an intent to exclude others from such control. Or, in the language sometimes used in the cases, to exercise dominion over the object possessed. One may have such an intent in the case of property actually belonging to another, because he intentionally wants to take it away from the owner. But he may also have this intent because he is mistaken as to the facts of legal ownership."

We have examined the cases cited by plaintiffs. Those cases state the rules and principles involved in adverse possession and point out that the asserter must prove by convincing evidence all the essential elements of adverse possession. None of the cases cited, however, is factually similar to instant case. The principles stated in those cases have been applied by us in reaching the instant result. Other adjudicated cases more nearly similar in their facts to instant case than any cited by plaintiffs, and which are authority for our action in affirming the trial court's conclusion that defendants established title to the land in question by adverse possession, are: Landers v. Thompson, 356 Mo. 1169, 205 S.W. 2d 544; Patterson v. Wilmont, Mo., 245 S.W.2d 116; and Peterson v. Harpst, Mo., 247 S.W.2d 663.

Plaintiffs filed a motion (taken with the case) to strike the statement of facts contained in respondents' brief on the ground that such statement did not purport to correct errors in plaintiffs' statement and, therefore, was not in compliance with Supreme Court Rule 1.08, 42 V.A.M.S. We need not rule the motion for the reason that such determination could not affect our ruling on the merits.

The judgment is affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.