Ward CRUMP and Vassel Crump, his Wife, Respondents,

v.

Malcolm McEWEN and Ethel McEwen, his Wife, Appellants.

No. 55621.

Supreme Court of Missouri, Division No. 1.

Dec. 13, 1971.

Samuel Richeson, Nicholas G. Gasaway, Dearing, Richeson, Roberts & Wegmann, Hillsboro, for respondents.

Colson & Wagner, by David L. Colson, Farmington, for appellants.

HIGGINS, Commissioner.

Action by plaintiffs under Section 527.150, V.A.M.S., to quiet title in them to approximately 244.27 acres of land; and counterclaim by defendants under Section 516.010, V.A.M.S., to quiet title in them to a portion of such acreage by adverse possession for over ten years.

Plaintiffs, by petition of November 6, 1968, alleged they were owners in fee simple of 244.27 acres, more or less, of land in Section 2, Township 39, Range 1, Washington County, Missouri. Their survey, Exhibit 1, in addition to a metes and bounds description, generally described the land as the "Rush Summers farm," being "All the N. ½ of NE ¼ of sec. 2. except 12A. sold to Philip Northcutt. & the Mo. Pacific RR. RW. cont. 11.02A. Also the E ½ of lots 1–2–3 of the NW ¼ of Sec 2 except 8.29A sold to the Mo Pac. R.R." Plaintiffs alleged also that defendants claimed some right, title or interest in and to the "East one-half of Lot 2 of the Northwest Quarter of said Section 2, the exact nature of which" they could not describe, and they prayed that title to the whole be quieted in them. Defendants denied plaintiffs' fee title ownership of the land and admitted the alleged claim in and to the east one half of Lot 2 of the northwest quarter of Section 2, asserting they were the fee simple owners "of that portion of the East one half (½) of Lot 2, Northwest quarter, Section 2, Township 39 North, Range 1 West lying and being West of the property fence line as now constructed between the property of the plaintiffs and the property of the defendants * * *." The fence line was described by courses and distances followed by the assertion "that the plaintiffs and

their predecessors in title * * * were not seized or possessed of said [disputed] property within ten (10) years prior to the commencement of this action, but that the defendants and their successors [predecessors] * * * have been in adverse possession * * * for more than ten (10) years, prior to the commencement of this action * * *."

The court found all issues for plaintiffs and against defendants; that plaintiffs are the fee simple owners of the 244.27 acres more or less, as per their survey made by Paul T. Johnson, Washington County Surveyor, September 1963; that the east half of Lot 2, northwest quarter, Section 2, Township 39, Range 1, thus owned by plaintiffs and the west half of said Lot 2, owned by defendants, adjoin; that the common boundary between the two halves is a straight line running southwardly from the northwest corner to the southwest corner of the said east half of Lot 2; that said line had been surveyed and marked by red-painted blazes on trees along said line by Paul Johnson; that defendants failed to prove their title by adverse possession of a portion of the east half of Lot 2. Accordingly, the court quieted title in plaintiffs to all the 244.27 acres and "particularly but without limitation" to the east half of Lot 2, northwest quarter, Section 2, Township 39, Range 1; and enjoined defendants from asserting any right, title or interest in any of said land, "and particularly, but without limitation," to the east half of said Lot 2.

At the outset of trial, the parties stipulated "that the issue here involved is the location of a line between the west half of Lot 2 and the east half of Lot 2 of the northwest quarter of Section 2, Township 39 North, Range 1 West, in Washington County; and that the plaintiffs have perfect title of record to the east half of Lot 2 of the said northwest quarter, and that the defendants have perfect title of record to the west half of Lot 2 of the northwest quarter." Accordingly, the trial court cor-

rectly found that record title to the disputed area of the east half of Lot 2 is in plaintiffs; and, since plaintiffs are the record owners of the disputed area, defendants had the burden of proving adverse possession of the disputed area for more than ten years as asserted in their answer. Ackerman v. Ryder, 308 Mo. 9, 271 S.W. 743, 747[3].

Thus, the only question on this appeal is whether the court erred in finding that defendants failed in their burden to prove such adverse possession. Appellants recognize that upon review of their jury-waived case the judgment "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Civil Rule 73.01(d), V.A.M.R.

On October 1, 1963, Paul Johnson, a nonregistered but nevertheless County Surveyor of Washington County, made a plat of a survey (Exhibit 1) for Rush Summers of land known as the old Jess Harmon property. In particular, he surveyed the line between the east and west halves of Lot 2, northwest quarter, Section 2, Township 39, Range 1. In the course of the survey he set stones at the southwest and northwest corners of the east half of Lot 2. Such stones marked the north and south ends of the line between McEwen (defendant) on the one side and the Harmon property or Rush Summers (plaintiffs' predecessor) on the other. He blazed line trees with an ax and painted the blazes red. There were no east and west fences enclosing any property at any point along the north and south line between the two halves of Lot 2. He did note a fence consisting of "one or two barbs over some old woven wire running north and south. Looked like it'd been there thirty or forty years." This fence was designated the "north-south Harmon fence" by witnesses. The old fence varied from the common boundary line between the two halves of Lot 2 about twenty feet at the south end to "maybe sixty or sixty-five feet" at the north. "The fence veered off to the east."

Plaintiff Ward Crump and his wife, Vassel, purchased the 244.27 acres and particularly the east half of Lot 2 from Rush Summers in October, 1963. At the time of purchase, there was no fence "connecting" the McEwen property to the Summers property. Mr. Crump examined the property to determine if the existing fence (the north-south Harmon fence) on the west side of his property was on the common boundary line and found that it was not. The surveyed line was about a hundred and twenty feet west of the old fence on Mr. McEwen's side of the fence. He later undertook to build a fence on the west line of his property on the line surveyed and blazed by Mr. Johnson. He began his fence along the line between the east and west halves of Lot 3, north of the McEwen property in Lot 2, and was stopped by McEwen when he got to the north corner of Lot 2 between his property and Mc-Ewen's west half of Lot 2. Sometime after the survey was made by Mr. Johnson, Mr. McEwen built some fence connecting to the north-south Harmon fence. He started it about one hundred and fifty feet south of the north division corner and ran it east to the old fence. Mr. McEwen also built an east-west fence near the south line of his Lot 2 to the old fence. The east-west fence on the south was "about a hundred and fifteen feet" long. He described McEwen's east-west fence on the north as "just three barbed wires, put up on sort of make shift posts"; the south fence was four strands of barbed wire and good posts.

Defendant Malcolm McEwen and his wife, Ethel, purchased the west half of Lot 2 from Johnny Rice in 1964 after first moving onto the property in May, 1963. The deed, however, was from Fred Miller because Johnny Rice had only a contract for deed. He walked "the inside of the fence lines" with Mr. Miller. He saw the part woven wire, part barbed wire, north

and south fence (north-south Harmon fence). It was in bad condition. He noted a "gap or gate" in the fence at its most northern part. The gap was "made out of a Cedar pole, limb, with a fine mesh wire, such as a six inch mesh wire. And, later barbed wire was put on it." He described the area between the red-blazed line and the old north-south fence as "rolling hill ground with brush" and approximately three acres in the creek bottom. He used the strip between the blazed line and the old fence. "One year I had a crop of oats; the next year I pastured; and I have been pasturing one half of this land in question continuously." He had cattle there and there was a cleared portion south of it. He estimated the strip between the blazed line and the old fence at three hundred feet at its widest point. He noted some rock piles along the old fence on the east side running generally parallel to it. He first became aware of a dispute "when Mr. Crump approached me to move the fence." He wanted to move it to the blazed line. He and Mr. Crump both had made repairs on the old fence, on one occasion when a bull went through the fence. Mr. McEwen also had a survey made, Exhibit A, and his survey line also went through "ninety point feet; I forget just what" west of the old fence.

Fred Miller "got it [the west half of Lot 2] off Bill Stroupe in '58." He conveyed it to Johnny Rice by contract for deed, and ultimately to Mr. McEwen. He showed Mr. McEwen the boundaries about a month after he bought. "He asked me to walk around the fences with him." He described the north-south Harmon fence as an old fence of mixed barbed and woven wire, some of which was attached to trees, some to posts. He also noted the gap at the north corner. With respect to the field west of the north-south Harmon fence, "The first year I had it I think I rented it to Rush Summers, he had cattle." According to him, Mr. Summers never made any claim on land west of the fence. Mr. Miller never cut any hay from any of the area

west of the fence, and he did not repair the fence other than to drive a few posts "to hold cattle in." He never farmed the disputed area but did have cattle on it. Mr. Miller remembered a road that formerly went on the outer or west side of Mr. Harmon's fence to the New Hope Church.

William Stroupe purchased the west half of Lot 2 from Crews and Strauser in 1951. At that time Mr. Harmon owned the east half of Lot 2 now owned by Mr. Crump. He knew of the north and south Harmon fence; he never discussed it with Mr. Harmon and he claimed the land west of the fence. He "mostly pastured it." Mr. Summers also owned the east half during his ownership of the west half of Lot 2. Both of them may have patched the old north and south fence. Mr. Stroupe admitted being told by people in the neighborhood that Mr. Harmon furnished the ground (west of the old fence) for a road going to the New Hope Church. The road was not used while he owned the west half but he did recall the road. He acknowledged that if the true division line was west of the fence, he would not want to claim any land between.

Glen J. Rice was the purchaser of the west half of Lot 2 by contract for deed between Miller and McEwen. He never used the land between the surveyed line and the old north-south fence. He showed the fence to Mr. McEwen as the boundary of the property. He never claimed to plaintiffs' predecessor that he owned up to the fence. He conceded that his contract for deed called for but "forty acres" and not more or less; and that he never wished to claim more than forty acres, it being necessary to claim up to forty-three acres to claim to the fence.

Walter Stoddard was a long-time resident in the area and was familiar with the north-south Harmon fence. He at one time rented land from Mr. Miller without objection from Mr. Summers. He did not know of any road west of the fence going to New Hope Church.

Claude L. Strauser lived in the neighborhood when the New Hope Church was in operation and he had occasion to travel the road from the church to what is now Highway 185. The road was "on the outside of Jess Harmon's field," west of his fence.

Willie Marshall farmed the Jess Harmon property before Mr. Summers (and ultimately plaintiffs) owned it. He helped repair the old north-south fence and "across going north there wasn't no fence connected there." Mr. Harmon always told him that his line was above this fence, "that he'd give the County a right of way there, that Mr. Miller wouldn't give any, and he did. * * * He [Mr. Harmon] wasn't that kind of a guy" to go over the fence and claim or pasture the land west of the fence.

John Harmon, son of the prior owner of the east half of Lot 2, recalled the strip used as a road to be a "narrow strip. * * * It was wide enough for a road, for wagons and things. It wasn't a road wide as we have roads today."

Finally, Mr. Crump stated that neither the north nor the south cross fences mentioned by defendants were present when he bought the east half of Lot 2; and Mrs. McEwen said that an east-west fence was cut by plaintiff in order to bring material in for the new north-south fence he was building.

It is apparent from the foregoing statement that the disputed tract lies wholly within the east half of Lot 2, bounded on the west by the survey line and on the east by the old north-south Harmon fence, with the line and fence separated by various distances up to two hundred feet, depending on which witness is found most reliable.

Appellants contend that the court erred in finding against them because they made a prima facie case of adverse possession to the disputed tract. In their argument, they assert their evidence made a prima facie case on each of the five elements of adverse possession as those elements are defined in the cases, e. g., Feinstein v. McGuire, Mo., 297 S.W.2d 513; Hedgpeth v. Maddux, Mo., 366 S.W.2d 314; Agers v. Reynolds, Mo., 306 S.W.2d 506; Miller v. Warner, Mo., 433 S.W.2d 259; City of Kirksville v. Young, Mo., 252 S.W.2d 286.

The difficulty with appellants' position is that even if it be assumed that the evidence shows a prima facie or submissible case of adverse possession by defendants, it does not follow that the trial court could not do otherwise than to find for them. The credibility of testimony favorable to their case, even where undisputed, was for the trier of the facts and, under the rule, this court may defer to the findings made below. Hunter v. Wethington, 205 Mo. 284, 103 S.W. 543, 545[5].

Nor does this judgment stand on determinations of credibility alone, because the evidence is in conflict on some of the elements of the asserted adverse possession:

The north-south Harmon fence to which defendants would claim, although shown to be older than ten years, was also shown as not intended to be on the true line but offset a short distance east for purposes of access to an old church.

The evidence of use of the disputed strip by defendants and their predecessors conflicts with respect to whether it was continuous and whether it was permissive. One such owner never intended to possess more than his forty acres.

The evidence conflicts with respect to whether the use was open and notorious. The tract is relatively small and does not appear to have been fully enclosed by defendants with east and west fences.

These and any other conflicts in the evidence were for the court to resolve; and it does not appear that the court's resolution of them was "clearly erroneous."

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., SEILER, J., and FINCH, Alternate Judge, concur.

BARDGETT, J., not sitting.

## APPENDIX

SEC. 2. T. 39-R-1-W. 947.46A

October 1. 1963

This plat shows a survey made for Williams realty co of Sullivan mo. of a farm known as the Rush Summers farm. all the N. ½ of NE ¼ of sec 2. except 12 A sold to Philip Northcutt & the M. O. Pacific RR. Rw. Cont. 11.02 A. also the E ½ of lots 1-2-3 of the NW ¼ of Sec. 2 except 8.29 A sold to the mo Pac. RR.

The above plat is a true, enlarged copy of sec. 2. T. 39-R-1-W as recorded in the plat book in the recorders office at Potosi mo. The survey made shown in blue    Paul F. Johnson
Surveyor, Washington county mo.

Plaintiffs' 1 Pg
12/4/69

[A4550]