[No. 49663-3.   En Banc.   January 26, 1984.]

KENT PETER CHAPLIN, ET AL, *Respondents,* v. PETER SANDERS, ET AL, *Petitioners.*

854

*Allendoerfer & Keithly, Inc., P.S.,* by *Gary W. Brand-stetter,* for petitioners.

*Michael A. Clarke* (of *Shields & Clarke*), for respondents.

UTTER, J.—A judgment was entered by the trial court in favor of Peter and Patricia Sanders, petitioners herein, awarding a part of property claimed by them by virtue of adverse possession from their neighbors Kent and Barbara Chaplin and Kenneth and Hazel Chaplin. The Court of Appeals reversed, finding no "hostility" in Sanders' possession of the property. We reverse the Court of Appeals and hold in favor of petitioners on all aspects of their claim.

This case presents two issues relating to the doctrine of adverse possession. Does a claimant's actual notice of the true owner's interest in the land possessed negate the element of hostility? Does the true owner's actual knowledge

of the claimant's use of his land satisfy the element of open and notorious? In light of the historical basis for the development of the adverse possession doctrine, we hold that the possessor's subjective belief whether the land possessed is or is not his own and his intent to dispossess or not dispossess another are irrelevant to a finding of hostility. We also hold that, when the true title owner knows of the possessor's adverse use throughout the duration of the statutory period, the element of open and notorious is satisfied.

## I

Petitioners Peter and Patricia Sanders, d/b/a Shady Glen Trailer Park, are record title owners of property in Snohomish County. Their property adjoins property owned by respondents Kent and Barbara Chaplin and Kenneth and Hazel Chaplin. The Chaplin property is to the east of the Sanders' property. This action concerns a dispute over a strip of land owned of record by the Chaplins, forming the western portion of their property and bordering the Sanders' eastern boundary line.

In 1957 or 1958, Mr. and Mrs. Hibbard, the Sanders' predecessors in interest, decided to clear their land of woods and overgrowth and set up a trailer park (hereinafter the western parcel). There was no obvious boundary between the western and eastern parcels, so Mr. Hibbard cleared the land up to a deep drainage ditch and opened his park.[1] He, further, installed a road for purposes of ingress and egress to the park.

In 1960, Mr. McMurray, then owner of the eastern parcel, had a survey conducted whereupon he discovered the true boundary. He then informed the Hibbards that their driveway encroached upon his land. Two years later, the

---

[1]This drainage ditch forms the eastern leg of the triangular strip of property in dispute, the true boundary line its western leg, and the intersection of the true boundary line and the drainage ditch its apex. The base is formed by a 30–foot-wide section in the southwest corner of the eastern parcel. The strip varies in width from 30 feet at its base to 1 foot at the apex, with the average width being approximately 15 feet.

Hibbards sold their parcel to the Gilberts. The 1962 Hibbard–Gilbert recorded contract of sale contained the following provision:

> The purchaser here has been advised that the existing blacktop road used by the trailer park encroaches on the adjoining property by approximately 20 feet and purchaser agrees that no claim will be made by him for any ownership of said 20 foot strip of property; and, in the event the owner of the adjoining property should remove blacktop, no claim will be made by the purchaser herein. Purchaser agrees to remove blacktop if requested to do so.

In 1967, the western parcel was sold to a Mr. French, who had no actual notice of the true boundary line. The western parcel changed hands once again before the Sanders purchased it in 1976. None of these subsequent owners were made aware that their road encroached on the eastern parcel, but were informed rather casually that the boundary was the drainage ditch. The Sanders were given actual notice of the contract provision, but purportedly mistook the road to which it referred.

Since its initial development in 1958, there was little change in the use of the western parcel. The road remained in continuous use in connection with the trailer park. The area between the road and the drainage ditch was also used by trailer park residents for parking, storage, garbage removal and picnicking. Grass was mowed up to the drainage ditch and flowers were planted in the area by trailer personnel and tenants. In the spring of 1978, the Sanders installed underground wiring and surface power poles in the area between the roadway and the drainage ditch.

In May of 1978, the Chaplins purchased the still undeveloped eastern parcel without the benefit of a survey. Soon thereafter they contacted an architectural consultant for the purpose of designing commercial buildings for their property. They had a survey conducted for this purpose and discovered the Sanders' encroachments. Despite this evidence, which indicated that the Sanders claimed some interest in the land, the Chaplins secured a rezone to a

more intensive commercial classification and instructed the architectural engineers to design buildings for the development based on the true survey line. They then brought this action to quiet title to the disputed portion and sought damages for increased construction costs due to the delay necessitated by this action.

The trial court determined that 1967, the date of acquisition by the Sanders' predecessor Mr. French, was the appropriate time from which to compute the 10–year period necessary to establish adverse possession. It then found that the Sanders had satisfied each element of adverse possession with regard to the road and its 3–foot shoulder (Parcel A), and quieted title in them to this portion. It found that the Sanders had not satisfied their burden of proving open and notorious possession with regard to the property between the roadway and the ditch (Parcel B) and quieted title to this portion in the Chaplins. The trial court then issued a mandatory injunction requiring the Sanders to remove their underground wiring and surface power poles at an estimated cost of $20,000.

The Court of Appeals found that, due to the Sanders' actual notice of McMurray's interest, the requirement of hostility had not been satisfied for either parcel. It therefore reversed the trial court's holding with respect to Parcel A, and remanded the cause with directions to quiet title in the Chaplins.

## II
### A

In order to establish a claim of adverse possession, the possession must be: (1) exclusive, (2) actual and uninterrupted, (3) open and notorious and (4) hostile and under a claim of right made in good faith. *Peeples v. Port of Bellingham,* 93 Wn.2d 766, 613 P.2d 1128 (1980); *Skansi v. Novak,* 84 Wash. 39, 146 P. 160 (1915). The period throughout which these elements must concurrently exist is 10 years. RCW 4.16.020. Hostility, as defined by this court, "does not import enmity or ill–will, but rather imports that

the claimant is in possession as owner, in contradistinction to holding in recognition of or subordination to the true owner." *King v. Bassindale,* 127 Wash. 189, 192, 220 P. 777 (1923). We have traditionally treated the hostility and claim of right requirements as one and the same. *Bowden–Gazzam Co. v. Hogan,* 22 Wn.2d 27, 154 P.2d 285 (1944).

Although the definition of hostility has remained fairly constant throughout this last century, the import we have attributed to this definition has varied. For example, in *King v. Bassindale, supra,* we held that, because the claimant believed the land to be his own and treated it as such, his possession was hostile as to the rest of the world. In contrast, in *Bowden–Gazzam Co. v. Hogan, supra,* we held that an adverse user who appropriated land knowing it was not his own, but who used it as his own for over the statutory period, was entitled to title by adverse possession. Our reasoning was that the claimant's subjective belief as to who owned the land was irrelevant so long as he intended to claim the land as his own. Yet, in dicta, we affirmed the age–old requirement that the claimant neither recognize a superior interest nor claim in bad faith. Our interpretation of this definition was further muddied in *Brown v. Hubbard,* 42 Wn.2d 867, 259 P.2d 391 (1953) wherein the claimant had mistakenly included a portion of his neighbor's property when fencing his own land. Although he had openly claimed and used the land as his own for well over the statutory period, we held that he had never formed the requisite hostile intent because he would not have claimed the land as his own had he known it belonged to his neighbor.

Thus, in *Bassindale* we required the claimant to possess a good faith belief that the land possessed was his own, in *Hogan* we deemed the claimant's belief irrelevant and in *Hubbard* we required the claimant to possess the unrighteous intent to deprive the true owner of his land. Shortly after *Hubbard* we set forth a test for hostility which took much of the emphasis off of the claimant's subjective intent. *O'Brien v. Schultz,* 45 Wn.2d 769, 278 P.2d 322

(1954).

In *O'Brien*, we observed that "[c]ourts have had considerable difficulty in determining 'intention' in adverse possession cases, because intention may be evidenced (1) by the *acts* of a party, or (2) by his *declarations*." *O'Brien*, at 780. We noted that, in Washington,

> the *acts* of the user most frequently control. If his *acts* clearly evince an intention to claim land as its owner, a general *declaration* by the user that he did not intend to claim another's land will not prove lack of intention. But a specific *declaration* by a user that he knew a fence was not the boundary and that he agreed to consider it as a temporary barrier will prove lack of intention. And if his *acts* are equivocal or do not clearly evince his intention to claim as owner, his *declaration* that he did not intend to take another's land, though not conclusive proof of lack of intention, may be considered in determining his intention while using the land.

(Citations omitted.) *O'Brien*, at 780.

*O'Brien* has not achieved the goal of setting forth a workable definition of hostile intent. Whenever acts are equivocal or declarations arguably specific the courts will be required to inquire into the claimant's subjective intentions, motives and beliefs regarding the land. *See, e.g., Peeples v. Port of Bellingham, supra.* The specific intent, motive and belief required is even less clear. In addition, because *O'Brien* attempted to reconcile, rather than overrule, disparate case law, many post–*O'Brien* cases exhibit a misunderstanding of the applicable rule. *See Fadden v. Purvis*, 77 Wn.2d 23, 459 P.2d 385 (1969); *Roy v. Goerz*, 26 Wn. App. 807, 614 P.2d 1308 (1980); *Hunt v. Matthews*, 8 Wn. App. 233, 505 P.2d 819 (1973). The resulting confusion necessitates our reexamination of this area of the law and mandates a new approach to the requirement of hostility. *See In re Marriage of Johnson*, 96 Wn.2d 255, 264, 634 P.2d 877 (1981).

B

The doctrine of adverse possession was formulated at law for the purpose of, among others, assuring maximum

utilization of land, encouraging the rejection of stale claims and, most importantly, quieting titles. 7 R. Powell, *Real Property* ¶ 1012[3] (1982); C. Callahan, *Adverse Possession* 91–94 (1961). Because the doctrine was formulated at law and not at equity, it was originally intended to protect both those who knowingly appropriated the land of others and those who honestly entered and held possession in full belief that the land was their own. R. Powell, at ¶ 1013[2]; C. Callahan, at 49–50; 3 Am. Jur. 2d *Advancements* § 104 (1962). Thus, when the original purpose of the adverse possession doctrine is considered, it becomes apparent that the claimant's motive in possessing the land is irrelevant and no inquiry should be made into his guilt or innocence. *Accord, Springer v. Durette,* 217 Or. 196, 342 P.2d 132 (1959); *Agers v. Reynolds,* 306 S.W.2d 506 (Mo. 1957); *Fulton v. Rapp,* 98 N.E.2d 430 (Ohio Ct. App. 1950); *see also* Stoebuck, *The Law of Adverse Possession in Washington,* 35 Wash. L. Rev. 53, 76–80 (1960).

Washington is not the only state which looks to the subjective belief and intent of the adverse claimant in determining hostility. *See, e.g., Ellis v. Jansing,* 620 S.W.2d 569 (Tex. 1981); *Van Valkenburgh v. Lutz,* 304 N.Y. 95, 106 N.E.2d 28 (1952); *see generally* 3 *American Law of Property* § 15.4 (A. Casner ed. 1952). However, the requirement has been regarded as unnecessarily confusing by many legal commentators, *see* Dockray, *Adverse Possession and Intention—I,* 1981–82 Conv. & Prop. Law. (n.s.) 256; C. Callahan; Stoebuck, 35 Wash. L. Rev. at 76–80; and A. Casner; and has been abandoned by the apparent majority of states. 3 *American Law of Property* § 15.5, at 785.

For these reasons, we are convinced that the dual requirement that the claimant take possession in "good faith" and not recognize another's superior interest does not serve the purpose of the adverse possession doctrine. *See Dunbar v. Heinrich,* 95 Wn.2d 20, 622 P.2d 812 (1980); *Wickert v. Thompson,* 28 Wn. App. 516, 624 P.2d 747 (1981). The "hostility/claim of right" element of adverse possession requires only that the claimant treat the land as

his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination.[2] *Cf.* RCW 7.28-.070 and 7.28.080. Under this analysis, permission to occupy

---

[2]Accordingly, we overrule the following cases, and any other Washington cases, to the extent that they are inconsistent with this opinion: *Peeples v. Port of Bellingham,* 93 Wn.2d 766, 613 P.2d 1128 (1980); *Muench v. Oxley,* 90 Wn.2d 637, 584 P.2d 939 (1978); *Fadden v. Purvis,* 77 Wn.2d 23, 459 P.2d 385 (1969); *Hill v. L.W. Weidert Farms, Inc.,* 75 Wn.2d 871, 454 P.2d 220 (1969); *Krona v. Brett,* 72 Wn.2d 535, 433 P.2d 858 (1967); *Frolund v. Frankland,* 71 Wn.2d 812, 431 P.2d 188 (1967); *Butler v. Anderson,* 71 Wn.2d 60, 426 P.2d 467 (1967); *Magelssen v. Cox,* 68 Wn.2d 785, 415 P.2d 645 (1966); *Thorsteinson v. Waters,* 65 Wn.2d 739, 399 P.2d 510 (1965); *Faubion v. Elder,* 49 Wn.2d 300, 301 P.2d 153 (1956); *Cabe v. Halverson,* 48 Wn.2d 172, 292 P.2d 220 (1956); *Booten v. Peterson,* 47 Wn.2d 565, 288 P.2d 1084 (1955); *O'Brien v. Schultz,* 45 Wn.2d 769, 278 P.2d 322 (1954); *Taylor v. Talmadge,* 45 Wn.2d 144, 273 P.2d 506 (1954); *Scott v. Slater,* 42 Wn.2d 366, 255 P.2d 377 (1953); *Brown v. Hubbard,* 42 Wn.2d 867, 259 P.2d 391 (1953); *Beck v. Loveland,* 37 Wn.2d 249, 222 P.2d 1066 (1950); *Fisher v. Hagstrom,* 35 Wn.2d 632, 214 P.2d 654 (1950); *State v. Stockdale,* 34 Wn.2d 857, 210 P.2d 686 (1949); *Young v. Newbro,* 32 Wn.2d 141, 200 P.2d 975 (1948); *Skoog v. Seymour,* 29 Wn.2d 355, 187 P.2d 304 (1947); *Bowden–Gazzam Co. v. Kent,* 22 Wn.2d 41, 154 P.2d 292 (1944); *Roesch v. Gerst,* 18 Wn.2d 294, 138 P.2d 846 (1943); *Eubanks v. Buckley,* 16 Wn.2d 24, 132 P.2d 353 (1942); *Mittet v. Hansen,* 178 Wash. 541, 35 P.2d 93 (1934); *White v. Branchick,* 160 Wash. 697, 295 P. 929 (1931); *Julien v. Herren,* 149 Wash. 573, 271 P. 891 (1928); *Wells v. Parks,* 148 Wash. 328, 268 P. 889 (1928); *Santmeyer v. Clemmancs,* 147 Wash. 354, 266 P. 148 (1928); *Metropolitan Bldg. Co. v. Fitzgerald,* 122 Wash. 514, 210 P. 770 (1922); *Threlkeld v. Conway,* 121 Wash. 624, 209 P. 1088 (1922); *Cameron v. Bustard,* 119 Wash. 266, 205 P. 385 (1922); *O'Donnell v. McCool,* 89 Wash. 537, 154 P. 1090 (1916); *Skansi v. Novak,* 84 Wash. 39, 146 P. 160 (1915); *Snell v. Stelling,* 83 Wash. 248, 145 P. 466 (1915); *Milbank v. Rowland,* 63 Wash. 519, 115 P. 1053 (1911); *Yesler Estate, Inc. v. Holmes,* 39 Wash. 34, 80 P. 851 (1905); *Suksdorf v. Humphrey,* 36 Wash. 1, 77 P. 1071 (1904); *Phinney v. Campbell,* 16 Wash. 203, 47 P. 502 (1896); *Wickert v. Thompson,* 28 Wn. App. 516, 624 P.2d 747 (1981); *Roy v. Goerz,* 26 Wn. App. 807, 614 P.2d 1308 (1980); *Danner v. Bartel,* 21 Wn. App. 213, 584 P.2d 463 (1978); *Fies v. Storey,* 21 Wn. App. 413, 585 P.2d 190 (1978); *Jackson v. Pennington,* 11 Wn. App. 638, 525 P.2d 822 (1974); *Hunt v. Matthews,* 8 Wn. App. 233, 505 P.2d 819 (1973); *Diel v. Beekman,* 7 Wn. App. 139, 499 P.2d 37 (1972); *Schmidt v. Hanson,* 5 Wn. App. 97, 485 P.2d 1007 (1971); *Howard v. Kunto,* 3 Wn. App. 393, 477 P.2d 210 (1970); *Spear v. Basagno,* 3 Wn. App. 689, 477 P.2d 197 (1970); *Rognrust v. Seto,* 2 Wn. App. 215, 467 P.2d 204 (1970); *Turner v. Rowland,* 2 Wn. App. 566, 468 P.2d 702 (1970).

the land, given by the true title owner to the claimant or his predecessors in interest, will still operate to negate the element of hostility. The traditional presumptions still apply to the extent that they are not inconsistent with this ruling.

## C

In the present case, due to the contract language manifesting Hibbard and Gilberts' recognition of McMurray's superior title, the trial court determined that their possession was not hostile to McMurray's interest. Under our holding today the contractual provision is no longer relevant. What is relevant is the objective character of Hibbard's possession and that of his successors in interest. Because the trial court did not make explicit findings regarding the character of the pre–1967 possession, we will look to the 1967–77 period in making our determination.

The trial court found the character of possession to have been hostile for at least a 10–year period. We agree. The Sanders and their predecessors used and maintained the property as though it was their own for over the statutory period. This was sufficient to satisfy the element of hostility.

## III

The Sanders also appeal from the trial court's finding that Parcel B was not possessed in an open and notorious manner.

In *Hovila v. Bartek*, 48 Wn.2d 238, 242, 292 P.2d 877 (1956), we stated that the requirement of open and notorious is satisfied if the title holder has actual notice of the adverse use throughout the statutory period. This is consistent with the purpose of the requirement, which is to ensure that the user makes such use of the land that any reasonable person would assume he is the owner. R. Powell, at ¶ 1013[2][b]. For this reason the owner is held to constructive notice of the possession. When the owner has actual knowledge of the possession, the requirement's purpose has been satisfied.

Here the trial court found that McMurray knew of the Hibbards' encroachments in 1960. He was aware of these encroachments until he sold to the Chaplins in 1978. Although the trial court explicitly found that McMurray knew of the road's encroachment on his land, it did not explicitly so find with regard to the strip running between the roadway and the ditch (Parcel B). Mrs. Hibbard testified at trial that she and her husband consistently maintained and mowed Parcel B. It would have been so maintained in 1960 when Mr. McMurray informed the Hibbards that their road was encroaching on his land. We are compelled to conclude, from this evidence, that McMurray was aware of the Hibbards' use of the strip abutting the roadway. This conclusion is all the more compelling when the disparate condition of McMurray's undeveloped, overgrown property and the cleared, mowed and maintained strip of land separating the roadway and McMurray's land is considered.

Although we could rest our holding that the requirement of open and notorious was satisfied on this alone, we find ample evidence to rest our holding on another ground as well. "[A]dverse possession is a mixed question of law and fact. Whether the essential facts exist is for the trier of fact; but whether the facts, as found, constitute adverse possession is for the court to determine as a matter of law." *Peeples v. Port of Bellingham, supra* at 771.

In determining what acts are sufficiently open and notorious to manifest to others a claim to land, the character of the land must be considered. *Krona v. Brett,* 72 Wn.2d 535, 433 P.2d 858 (1967). "The necessary use and occupancy need only be of the character that a true owner would assert *in view of its nature and location." Krona,* at 539.

In the present case the trial court found that, during the relevant statutory period, the western parcel was cleared up to the drainage ditch while the eastern parcel remained vacant and overgrown. The residents of the trailer park mowed the grass in Parcel B and put the parcel to various uses: guest parking, garbage disposal, gardening and pic-

nicking. Some residents used portions of Parcel B as their backyard. The trial court concluded that the contrast between the fully developed parcel west of the drainage ditch and the overgrown, undeveloped parcel east of the drainage ditch was insufficient to put the owners of the eastern parcel on notice of the Sanders' claim of ownership. We disagree.

Accordingly, the case is reversed and remanded with directions to quiet title to the disputed property in the Sanders.

WILLIAMS, C.J., ROSELLINI, BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.