Siddoway, C.J.
¶1 — In determining whether a person has acquired title to real property through adverse posses *69 sion, the fact that he or she was given permission to occupy land by the true title owner will operate to negate the essential element of hostility. But in the case of a failed parol agreement to adjust a boundary line, the fact that the true title owner agreed that his neighbor would own whatever land fell on the neighbor’s side of the agreed line does not negative the element of hostility. As some authorities have put it, parties can agree to a nonowner’s use of land that is adverse.
¶2 Accordingly, while an oral agreement that David Aalgaard reached with the Aalgaards’ former neighbor as to their shared property line is not enforceable, the existence of that agreement does not detract from the Aalgaards’ evidence that following the 1993 agreement, they adversely possessed an area on which they built a home and outbuildings and lived for 20 years. Because the undisputed evidence demonstrates that the Aalgaards have satisfied the elements of adverse possession to at least some of the property held of record by John and Rola LeBleu, we reverse the trial court’s order granting summary judgment to the LeBleus and remand for further proceedings consistent with this opinion.
FACTS AND PROCEDURAL BACKGROUND
¶3 In September 1991, Eric and Kim Deno purchased approximately 20 acres of property in Chattaroy. At that time, their seller—who had retained property to the north—walked the property with Mr. Deno and showed him the location of the property’s boundary lines.
¶4 In June 1993, the same seller sold his remaining parcel north of the Deno property (also approximately 20 acres) to Dave and Louella Aalgaard. Shortly thereafter, Mr. Deno and Mr. Aalgaard walked and measured their respective properties and established a boundary line that Mr. Deno described as
a straight line defined by our agreement as to the location and physical monuments and features between our respective par *70 cels. The line ran from a 90° corner then down along the center of a natural gully dividing our parcels.
Clerk’s Papers (CP) at 341. Mr. Deno describes their agreement on the boundary line as “important” because he planned to assist the Aalgaards in building the home on their property. Id.
¶5 Following the men’s agreement on the property line, the Aalgaards began building their home “at least 50 feet, if not more from the common boundary line” they had established. Id. The foundation of the Aalgaards’ home was placed with Mr. Deno’s assistance. With the help of Mr. Deno, the Aalgaards finished building their home in 1994. They later installed a water line, a propane tank, a barn, a woodshed, and a shop on the property, “approximately 30 feet from the agreed boundary line.” CP at 308.
¶6 In 2012, John and Rola LeBleu bought the property formerly owned by the Denos. In November 2013, Bruce Larsen of Landtek LLC was engaged to perform a survey and discovered that the Aalgaards’ home, barn, and shed were located on the LeBleus’ property. In preparing his survey map, he drew “clearing limits,” which he describes as “the area that is out of the woods and appeared to be used by the Aalgaards.” CP at 211. He measured the area as containing approximately 0.61 acres.
¶7 The LeBleus brought suit against the Aalgaards a month later, seeking possession of all the property to which the LeBleus held record title and an injunction requiring the Aalgaards to remove their improvements. The Aalgaards counterclaimed, asking that the court quiet title to the disputed property in them based on multiple theories, including parol agreement, acquiescence, and adverse possession.
¶8 Both sides moved for summary judgment, which the trial court granted in the LeBleus’ favor. In ruling on the adverse possession claim, the court reasoned that the hostility element could not be shown because the Aalgaards *71 used the property with Mr. Deno’s permission. The court quieted title in the LeBleus, ejected the Aalgaards, and ordered them to remove their house, barn, and shed from the property within 30 days.
¶9 Upon the Aalgaards’ filing of a notice of appeal, the court stayed its order of ejectment.
ANALYSIS
 ¶10 To establish a claim of adverse possession, a party’s possession of property must be (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile and under a claim of right. Chaplin v. Sanders, 100 Wn.2d 853, 857, 676 P.2d 431 (1984). All of these elements must exist concurrently for at least 10 years. RCW 4.16.020. Because courts presume that the holder of legal title is in possession, “the party claiming to have adversely possessed the property has the burden of establishing the existence of each element.” ITT Rayonier, Inc. v. Bell, 112 Wn.2d 754, 757, 774 P.2d 6 (1989).
¶11 The only element of adverse possession that the LeBleus claim is not established by the Aalgaards is that of hostility. Hostility “ ‘does not import enmity or ill-will.’ ” Chaplin, 100 Wn.2d at 857 (quoting King v. Bassindale, 127 Wash. 189, 192, 220 P. 777 (1923)).
The “hostility/claim of right” element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination.
Id. at 860-61.
¶12 The Aalgaards treated the property as their own; they constructed a home and other significant improvements. “The construction and maintenance of a structure *72 partially on the land of another almost necessarily is exclusive, actual and uninterrupted, open and notorious, hostile and made under a claim of right.” Draszt v. Naccarato, 146 Wn. App. 536, 542, 192 P.3d 921 (2008) (citing Reitz v. Knight, 62 Wn. App. 575, 582, 814 P.2d 1212 (1991)). Professor Stoebuck has suggested that the most useful general test of hostility is, “Considering the character of possession and the locale of the land, is the possession of such a nature as would normally be objectionable to owners of such land?” 17 William B. Stoebuck & John W. Weaver, Washington Practice: Real Estate: Property Law § 8.12, at 526 (2d ed. 2004) (citing People’s Sav. Bank v. Bufford, 90 Wash. 204, 155 P. 1068 (1916)). Normally, constructing a home, outbuildings, and infrastructure on a neighbor’s residential parcel would be highly objectionable.
¶13 In the trial court, the LeBleus successfully invoked the presence in this case of “permission.” But permission to do what? Mr. Aalgaard and Mr. Deno indisputably reached an agreement in 1993. But before equating an agreement with permissive use that will negate the element of hostility, one must consider the agreement.
 ¶14 Washington cases hold that permissive use of the sort that will negate hostility and prevent adverse possession is use based on a personal, revocable license from the true title owner. E.g., Miller v. Anderson, 91 Wn. App. 822, 829, 964 P.2d 365 (1998); Teel v. Stading, 155 Wn. App. 390, 395, 228 P.3d 1293 (2010); Granston v. Callahan, 52 Wn. App. 288, 294, 759 P.2d 462 (1988) (citing Black’s Law Dictionary 1298 (rev. 4th ed. 1968)). If there is no explicit agreement but only unobjected-to use, it is reasonable to infer a personal revocable license. But where there is an explicit agreement, it can be agreement to something that is different from “permission” in this sense. It can be *73 agreement to adverse use, such as an agreement to a permanent boundary line.[1]
¶15 A leading treatise explains:
[I]t appears reasonably safe to say that a user is adverse if not accompanied by any recognition, in express terms or by implication, of a right in the landowner to stop such user now or at some time in the future. The recognition of the landowner’s right to put an end to the user precludes any presumption, from his failure to assert such right, that no such right exists. . . .

When the owner undertakes to confer upon another a perpetual right of user in the land, but fails to do so in a valid manner, as when he makes an oral grant of an easement, the user of the land by such other in accordance with the terms of the invalid grant cannot be regarded as permissive and in subordination to the rights of the landowner, but is in effect adverse to such rights. Such a case is analogous to that of the possession of land under an invalid conveyance thereof, which is ordinarily adverse to the grantor. The user of the land under such circumstances involves no recognition of any right as remaining in the grantor.
4 Herbert Thorndike Tiffany, The Law of Real Property § 1196 (3d ed. 1975) (footnotes omitted).
¶16 Washington cases dealing with prescriptive easements are in accord. In Lechman v. Mills, 46 Wash. 624, 91 P. 11 (1907), the evidence showed that a predecessor owner of land had verbally granted an easement for a water ditch across his land. The purported grantee constructed the ditch and then used it in an exclusive, open, notorious, and hostile manner for a period sufficient to acquire a prescriptive right. In rejecting the title holder’s argument that use of the ditch had been permissive, the court observed that evidence supported the trial court’s finding that the agree *74 ment made “was not a mere revocable license or permission to occupy, but that it was intended to operate as a grant.” Id. at 628. Such an agreement could not be equated with permissive use:
[T]he use was not deprived of its adverse character or rendered merely permissive for the purposes of the statute of limitations, by a showing that it was preceded by an oral agreement amounting in terms to a grant but void under the statute of limitations.
“It is generally agreed that use of an easement under claim of right by virtue of a parol grant, may be adverse so as to give it title by prescription, although the parol grant itself is void under the statute of frauds.” 22 Am. & Eng. Ency. Law (2d ed. [1902]), p. 1198, and cases cited.
Id. at 629.
¶17 A Washington adverse possession case also illustrates the difference between agreement to a permissive use and agreement to an adverse use. In Beck v. Loveland, 37 Wn.2d 249,222 P.2d 1066 (1950), overruled, on other grounds by Chaplin, 100 Wn.2d at 861 n.2, neighboring landowners, not wanting to incur the cost of a survey, agreed on a tentative fence line but with the understanding that it was subject to correction by a survey. The tentative nature of the agreement was decisive in the court’s analysis:
[The grantor, Chapman,] never varied from his testimony to the effect that he and his grantee, Powell, never intended that either one of them would claim any land beyond the north and south center line of the quarter section, and that the line of the north and south fence which the parties erected was only tentatively agreed upon as the boundary line between their properties and was always subject to correction if a survey demonstrated that the fence was not along the true line referred to in the deed.
Id. at 254. Inasmuch as the mutual permission given was only to occupy and use any land that fell on the other *75 party’s side of the fence until a survey established the true line, the occupation and use of unowned land was not hostile. When a survey later revealed that the fence encroached on the land of a successor to one of the parties, he was entitled to take it down. The court explained that the result would have been different had the nature of the agreement been different:
In order to prevail in the case at bar, it would be necessary for appellants, who acquired title to their property in 1947, to show that Powell, their predecessor in interest, had maintained possession, at least for a considerable period, of the strip in question while claiming to own it. This claim is clearly not supported by the testimony, including that of witnesses called by appellants.
Id. at 259 (emphasis added).
¶18 Here, the declarations of Mr. Aalgaard and Mr. Deno do not reveal an agreement that was tentative and subject to correction by any future survey. Their declarations state that they were “establish[ing],” “agree[ing],” and “defin[ing]” their common boundary line. CP at 307, 272. In support of their alternative theory of parol agreement, the Aalgaards argued to the trial court that they and the Denos were uncertain as to the true boundary line between their properties and, therefore, made a “permanent agreement, clearly specifying where the boundary line was located.” CP at 335. Even the court observed that the 1993 agreement was more like the foundation of a parol agreement or acquiescence claim (although those theories failed because the Aalgaards could not prove a clearly marked boundary) because in a “classic adverse possession case,” you would not have “two parties go out and say, by golly, this is the line.” Verbatim Report of Proceedings (VRP) at 28.
¶19 The failure of the parol agreement did not prevent the Aalgaards from acquiring title by adverse possession to the extent that for at least 10 years following the oral agreement, they possessed land on their side of the agreed line exclusively, actually and uninterruptedly, *76 openly and notoriously, hostilely and under a claim of right. Chaplin, 100 Wn.2d at 857. Mr. Deno’s agreement that the Aalgaards would own whatever fell on their side of the agreed property line does not negative the element of hostility—arguably, it strengthens the adverse possession claim. A similar example is offered by Professor Stoebuck:
Suppose one neighbor says to the other, “I think my fence, and part of my rockery, shrubbery, and lawn may be over a few feet onto your side,” and the other replies, “Okay.” Did one seek, and the other grant, permission? If “okay” meant only, “I know you are an adverse possessor,” that should, if anything, strengthen the adverse possession by insuring that it was “notorious.”
17 Stoebuck & Weaver, supra, § 8.12, at 527; cf. Robert v. Perron, 269 Mass. 537, 169 N.E. 489, 490 (1930) (possession pursuant to an understanding that recognizes no further right in the owner and amounts to an assurance that owner will not interfere with possession now or ever is, for adverse possession purposes, adverse, not permissive); accord Calkins v. Kousouros, 72 Idaho 150, 157, 237 P.2d 1053 (1951) (citing Robert, 169 N.E. 489).
¶20 The lawyer for the LeBleus nonetheless urged us at oral argument that our view cannot be reconciled with Granston, Miller, and Teel. We disagree.
¶21 Granston involved two brothers who knowingly constructed a barn, corral, driveway, and walks on each other’s waterfront properties, and were found to have done so permissively. Because a permissive use ends when the licensor dies (here, the brothers had passed), the appellate court concluded that rights their children claimed by adverse possession in large part failed. Moreover, the court held that because the use had been permissive, testing hostility by whether the permitted user treats the property as his own (e.g., by building a structure) is not helpful. 52 Wn. App. at 293. “[A] different set of rules applies when the initial use is permissive.” Id.
¶22 The critical first step, then, is to determine whether the initial use is permissive. In Granston, the court noted *77 that a finding of permissive use is supported by evidence of a close, friendly relationship or family relationship and found it significant that the brothers’
affection for each other and completely open, cooperative, and trusting lifestyles were completely consistent with an implied permission by each to the other to use his property and the improvements freely.
Id. at 295. The court held that the facts before it demonstrated “a clear, almost indisputable, case of permissive use.” Id.
¶23 Here, by contrast, Mr. Deno and Mr. Aalgaard had no preexisting relationship or family relationship. By the LeBleus’ admission, the position of the two men was that “they did not know where [the boundary line] was so they made a permanent agreement, clearly specifying where the boundary line was located, which resolved the uncertainty.” Br. of Resp’ts at 12.
¶24 Miller and Teel also involve use of an owner’s property that was established to be permissive at its inception but that neighbors claimed became adverse thereafter—in Miller, through a change in title, and in Teel, through a distinct change in use. Because the LeBleus have treated “agreement” in this case as synonymous in every case with “permissive use,” they assume that some distinct, post-1993 notice by the Aalgaards of adverse use was required but is lacking.
¶25 For reasons stated, we reject the premise that Mr. Aalgaard’s and Mr. Deno’s initial agreement was that each family would have permissive use of the land on its side of the agreed line. The undisputed evidence is of an agreement that each family would own the land on their side of the agreed line—perpetual, exclusive use, necessarily adverse. Because the agreement in this case was for mutually adverse use at its inception, no notice of a distinct change in use was required.
¶26 There remains the issue of the proper boundary line between the parties’ property based on the Aalgaards’ *78 adverse possession. Mr. Larsen’s depiction of “clearing limits” in his survey is one piece of evidence. But the trial court correctly recognized that the boundary line established by adverse use remains a question of fact, to be determined based on the use and occupancy of the character that a true owner would assert in view of the property’s nature and location. VRP at 24-25; Chaplin, 100 Wn.2d at 861-63.
¶27 We reverse and remand for proceedings consistent with this opinion.
Korsmo and Fearing, JJ., concur.

 We need not address a disagreement over whether the Aalgaards have changed their position on appeal as to whether Mr. Aalgaard and Mr. Deno were attempting in 1993 to find the actual property line, or were simply settling on an agreed line. It does not matter to our analysis.