IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| MARK E. MARTIN and DEBRA A. MARTIN, husband and wife, | No. 53831-8-II |
| Respondents, | |
| v. | |
| BENJAMIN ORVOLD and COREY ORVOLD, husband and wife, and the marital community composed thereof, | UNPUBLISHED OPINION |
| Appellants. | |

GLASGOW, J.—After a bench trial, the trial court concluded that Mark and Debra Martin had acquired a piece of their neighbors' land through adverse possession. The trial court also ordered injunctive relief in the Martins' favor and entered mutual restraining orders.

Barbara and Corey Orvold, the affected neighbors, appeal, arguing that several findings of fact were not supported by substantial evidence. They contend the trial court erred by concluding that the Martins satisfied the elements of hostility and open and notorious use necessary to prove adverse possession. The Orvolds also argue that the trial court abused its discretion by entering a restraining order against them. The Orvolds further assert that the trial court erred by awarding attorney fees to the Martins without segregating fees for some claims. Both parties request attorney fees on appeal.

We affirm. We also award attorney fees to the Martins on appeal.

No. 53831-8-II

## FACTS

This case concerns a dispute over a gravel parking strip located in a cul-de-sac in Puyallup, Washington. After a three-day bench trial that involved testimony from 27 witnesses, including the Martins, the Orvolds, and many neighbors, the trial court made findings of fact and conclusions of law. The following facts were found by the trial court after a bench trial and most of these facts are not in dispute.

A.      Background

The Martins and the Orvolds own property across the street from each other. The Martins' and Orvolds' properties are part of a residential subdivision that includes a private road running north to south and ending in a cul-de-sac. The private road runs down the center of a 60-foot-wide nonexclusive easement, and the road is narrower than the easement.



Clerk's Papers (CP) at 494.

As shown in the photo above, the Orvolds' house is on the west side of the road and the Martins' house is on the east side of the road. The Martins' driveway was steep and only wide enough for one car at a time. In 1992, to make parking easier, add additional parking, and provide

2

a flat space for their garbage cans, the Martins created a parking area below their driveway. The parking strip that the Martins built is the black triangular shaped area in the photo above.

As the red property boundary lines in the photo reflect, the Orvolds' property originally extended across the private road. In a summary judgment ruling and stipulation that the Orvolds do not appeal, the Martins were awarded title through adverse possession to the portions of the Orvolds' land east of the road abutting their property (part of the landscaped hillside and the Martins' driveway), except the parking area represented by the black triangle, which the Martins were awarded following a bench trial. This parking area is the subject of this appeal.

B.      Gravel Parking Strip

To create the parking area in 1992, Mark[1] "excavated and flattened a [7 foot by 25 foot] section of the hill" above the street. CP at 1004. He then brought in gravel and covered the surface of the parking strip. The Martins landscaped the hillside area above the parking strip by planting ivy. They then maintained the gravel parking strip and hillside landscaping.

The Martins never asked for and were never given permission from anyone else to create or use the parking strip. In 1993, Jon Pulicicchio, a prior owner of the Orvold property, told the Martins he had just learned that he owned the area where the gravel parking strip was located, as well as a portion of the landscaped hillside and the Martins' driveway. Pulicicchio also told the Martins that he obtained insurance coverage for those areas. The Martins did not ask Pulicicchio for permission to use or maintain his land and Pulicicchio did not give them permission to do so. Neither of the other prior owners of the Orvold property gave the Martins permission to use or maintain the parking strip, nor did they object to their use.

---

[1] We use the first names of the Martins and Orvolds to avoid confusion.

3

Members of the Martin family were the primary users of the gravel parking strip from 1992 to 2015, using the space "between 90-100 [percent] of the use, compared to the rest of the world." CP at 1006. Mark parked his truck in the gravel strip daily until 2008. Debra used the parking strip when it snowed, and her social guests also used it regularly. From 1992 until the mid-2000s, Mark's mother parked there several times a week to babysit the Martins' youngest daughter, Lindsey. Once Lindsey got a driver's license, she parked in the gravel strip daily from 2008 to 2012. The Martins' other adult children and grandchildren also used the parking strip when they visited.

The trial court found that property owners on the Martins' side of the road typically "treated the easternmost unpaved strip [of the easement] as extensions of their property" and used this strip for landscaping and parking, while property owners on the Orvolds' side of the road "typically did not . . . use or maintain the easternmost unpaved strip." CP at 1003. If someone other than an east side owner wanted to use the unpaved strip on the eastern side of the road, they generally asked permission of the "owner of the immediately abutting eastern lot," and this "usually only [occurred] on special occasions where overflow parking was needed." *Id*.

The trial court found that third parties only occasionally used the parking strip and "the Martins usually either gave their permission or allowed the parking as a neighborly accommodation." CP at 1006. The Orvolds do not dispute, however, that the Martins told two other neighbors not to park their vehicles in the parking strip.

The Martins were the only people who maintained the gravel parking strip. CP at 1006. The trial court found that "[t]here was no evidence presented that at any time between 1992-2015,

the Martins ceased using or maintaining the [gravel parking strip,]" but the Orvolds dispute this finding. CP at 1007.

C.      Relationship Between the Martins and the Orvolds

In 2015, the Orvolds purchased and moved to the property across the street from the Martins. The Orvolds testified that they began using the parking strip in 2015, they believed they owned it, and the Martins did not initially object. The Martins and the Orvolds had a cordial relationship until April 2018, when Corey and one of the Martins' daughters got in a heated argument about the parking strip.

In May 2018, the Martins re-graveled the parking strip. The Orvolds then called the police, who talked to both parties but took no further action. Shortly after the police left, Corey pulled her car into the gravel parking strip, followed by another neighbor, Ryan Radke, who parked his car behind hers. The two "high fived" and then moved their cars about 20 minutes later. CP at 1009.

The trial court also found that the Orvolds' home security system recorded both audio and video. The trial court found that the Orvolds used their security system to make "illegal recordings of conversations that took place as far away as the Martins' driveway." CP at 1008.

D.      Lawsuit and Procedural History

The Martins sued the Orvolds in June 2018, arguing that they had established through adverse possession that the western boundary of their property was the "edge of the graveled area abutting the street and where [the Martins'] driveway, lawn, landscaping and graveled parking area abuts the street." CP at 5. The Martins and Orvolds each moved for summary judgment. The trial court granted the Martins' motion for the disputed portions of the Martins' driveway and landscaping on their side of the road, but not the graveled parking strip. The parties entered a

stipulated agreement transferring title to the Martins for the portions of the disputed land resolved on summary judgment.[2] The parties continued to litigate their claims to the parking strip, however.

In November 2018, the Orvolds had large concrete barriers placed in front of the parking strip. The Martins requested an injunction ordering the Orvolds to remove the barriers, which the trial court granted. In response to cross motions for additional injunctive relief, the trial court "ordered the parties to stop photographing and filming each other on their own property or in the [gravel parking strip]." CP at 1009. Although the Orvolds removed the concrete barriers, both parties continued photographing and recording each other despite the court's order.

E.      Trial Court's Conclusions

The parties proceeded to a bench trial to resolve the remaining issues related to the parking strip. After reciting its findings, the trial court concluded that the Martins had established the elements of adverse possession with regard to the gravel parking strip. Relevant to this appeal, the trial court concluded that the Martins' use of the parking strip was hostile for at least 10 years because the Martins used the gravel parking strip as a true owner would. The trial court emphasized that the Martins created the parking strip, never asked for and never received permission to use or maintain it, exclusively maintained it prior to 2015, gave some neighbors permission to use the strip, and excluded others.

The trial court also found that the Martins' use of the parking strip was open and notorious throughout the statutory period. The trial court concluded the Martins met the other elements of adverse possession. Title automatically vests in an adverse possession claimant when they have met the requirements for adverse possession for 10 years, and the trial court found that title to the

---

[2] The Orvolds do not appeal this order.

parking strip vested in the Martins in 2002, 10 years after they created the parking strip and long before the Orvolds purchased their property. The trial court quieted title in favor of the Martins.

The trial court granted the Martins' request for an injunction prohibiting the Orvolds from using the parking strip without the Martins' permission. It concluded that based on the Orvolds' past actions, including bringing in concrete barriers and failing to follow court orders prohibiting the parties from photographing or recording each other, allowing the Orvolds to use the parking area without the Martins' permission would "render the [trial] [c]ourt's judgment ineffectual." CP at 1013.

The trial court also restrained both parties "from photographing, filming, recording, or otherwise surveilling each other" for two years. CP at 1014. The trial court's order provided that if either party's security system was equipped to record audio, "the audio recording feature shall be disabled immediately unless the party has obtained written consent" to record. *Id*. The trial court also restrained both parties from shining flood lights in each other's windows and required that any security lighting be motion sensitive and "pointed at the party's own property, not at or across the street." *Id*.

Finally, the trial court concluded that the Martins were the prevailing party and that they were entitled to attorney fees and costs under RCW 7.28.083(3). The Orvolds unsuccessfully argued that the trial court should not require them to pay attorney fees incurred by the Martins in litigating the restraining orders because the trial court ultimately entered mutual orders that restrained both parties. The trial court concluded that it could not segregate the attorney fees because the adverse possession, injunctive relief, and restraining order claims were intertwined and tried together in one trial. The trial court also emphasized that although the restraining orders

were mutual, the Martins were the "prevailing party as far as injunctive relief [was] concerned." 6 Verbatim Report of Proceedings (VRP) at 715.

The Orvolds appeal the trial court's findings of fact and conclusions of law, the judgment quieting title to the parking strip in favor of the Martins, the award of injunctive relief and mutual restraining orders, and the judgment granting the Martins attorney fees and costs. Both parties request attorney fees and costs on appeal.

ANALYSIS

I. DISPUTED FINDINGS OF FACT

The Orvolds argue that five findings of fact were not supported by substantial evidence. We disagree.

We "review[] a trial court's findings of fact for substantial evidence." *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). We consider whether the evidence was "sufficient to persuade a fair-minded, rational person of the declared premise." *Id.* We "defer[] to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence and credibility of the witnesses." *Thompson v. Hanson*, 142 Wn. App. 53, 60, 174 P.3d 120 (2007). We cannot "reweigh or rebalance competing testimony and inferences even if we may have resolved the factual dispute differently." *Bale v. Allison*, 173 Wn. App. 435, 458, 294 P.3d 789 (2013). Even if disputed, evidence is substantial if sufficient to persuade a reasonable person of its truth. *See McCleary v. State*, 173 Wn.2d 477, 514, 269 P.3d 227 (2012).

A.     Findings of Fact Regarding Permission to Use the Parking Strip

The Orvolds contend that substantial evidence did not support the trial court's finding that "owners from the west side of the street did not use the land on the east side of the street, and that

if anyone used that land they asked permission from the adjoining property owner." Br. of Appellant at 27 (bold type omitted). The Orvolds also challenge the trial court's finding "that, whenever someone other than the Martins parked in the [gravel parking strip], the Martins either gave permission or allowed the parking as a neighborly accommodation." *Id.*

Substantial evidence supports these findings. Debra testified that she only occasionally saw people who lived on the west side of the road use the unpaved easement area on the east side. Melissa Horton, a neighbor, testified that "[t]he east side people take care of [their side] and I've never seen anybody from the west side care for the east side." 3 VRP at 156. Neighbor Edward Meier affirmed that unless someone in the cul-de-sac had a party or other event that necessitated overflow parking, people tended to park in front of their own houses. Neighbor Shane Klingenstein testified that east side residents treated the unpaved easement area as their own property and he never saw west side residents use the east side unpaved easement area.

The Orvolds point out that some neighbors testified that they parked in the gravel parking strip without asking the Martins for permission. Radke said he parked in the gravel area 60 to 70 times per year since 1991 and that whenever a dispute over use of the area arose, he and the Martins went to the owner of what is now the Orvolds' property to settle the dispute. And Bonita Anderson testified that the gravel parking strip was used by various neighbors as an "open parking area" and that her tenant, Reginald York, even parked his semi-truck in the gravel parking strip. 4 VRP at 521.[3]

---

[3] York himself, however, testified that he only parked his semi-truck in the gravel parking strip "twice for a short period," and parked his personal truck there "once in a great while." 5 VRP at 588.

Testimony from neighbors generally demonstrated that the Martins did not object when neighbors used the parking strip in front of the Martins' house on rare occasions when neighbors needed overflow parking. But Mark testified that they tolerated occasional use without comment because it "[j]ust seemed the neighborly thing to do." 3 VRP at 146.

We may not reweigh the evidence or the trial court's credibility determinations on appeal. *Bale*, 173 Wn. App. at 458. Some witnesses offered contradictory testimony, but substantial evidence supported the trial court's finding that residents of the east and west sides of the road tended to use the unpaved portions of the easements on their own sides of the road and the Martins generally gave permission to third parties to park in the gravel parking strip or permitted occasional use without comment. *See McCleary*, 173 Wn.2d at 514. Substantial evidence supported these challenged findings of fact.

B.      Findings of Fact Regarding Consistent Use and Maintenance

The Orvolds contend that substantial evidence did not support the trial court's findings that Mark parked in the gravel parking strip until Lindsey was old enough to drive and the Martins consistently maintained the parking strip starting in 1992.

The trial court properly found that the Martins' use and maintenance of the parking strip was continuous from 1992 to 2015. The Martins, their children, and multiple neighbors testified that the Martin family used the graveled parking space consistently from 1992 until 2015. And the Martins and their neighbors testified that the Martins regularly maintained the gravel parking strip and landscaping on the hill during this time period.

The Orvolds claim the evidence was insufficient to show that the Martins regularly used and maintained the area because Mark conceded he did not use the parking strip "every minute"

during the 1990s, but only used it as needed and the Martins had "no set schedule" for re-graveling the parking strip. Br. of Appellant at 29. This testimony would not prevent a reasonable fact finder from concluding that, based on the totality of the testimony, the Martins used and maintained the gravel parking space consistently until the Orvolds moved in. *See Merriman*, 168 Wn.2d at 631. We hold that substantial evidence supported these challenged findings.

C.      Finding of Fact Regarding the Recording of Private Conversations

The Orvolds argue that the trial court erred by finding that their security system could record private conversations in the Martins' driveway. The Orvolds contend that any recorded communications were not private because they put up a sign indicating that their security system recorded audio, and anyone speaking on the Orvolds' property or in the street did not have a reasonable expectation of privacy.

The trial court's finding was supported by substantial evidence because Mark testified that when he played videos provided by the Orvolds in discovery, he could "hear audio up into our driveway. It's not super clear in some instances, but you can hear stuff." 4 VRP at 304. No other witness contradicted Mark's testimony. A reasonable fact finder could conclude that the Orvolds' security system recorded private conversations on the Martins' property. *See Merriman*, 168 Wn.2d at 631. Substantial evidence supported this finding of fact.

The challenged factual findings were all supported by substantial evidence in the record and the "[u]nchallenged findings are verities on appeal." *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

## II. ADVERSE POSSESSION

The Orvolds argue that the trial court erred by quieting title to the gravel parking strip in the Martins' favor because they failed to establish that the Martins' use of the gravel parking strip was hostile and open and notorious. We disagree.

A.     Adverse Possession Elements and Standard of Review

"The doctrine of adverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is '(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.'" *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71-72, 283 P.3d 1082 (2012) (quoting *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989)). "Title vests automatically in the adverse possessor if all the elements are fulfilled throughout the [10-year] period." *Id*. at 72. The party claiming adverse possession has the burden of proving each element by a preponderance of the evidence. *Teel v. Stading*, 155 Wn. App. 390, 394, 228 P.3d 1293 (2010). Because "all of the four traditional elements of adverse possession lead to the same end of showing possession of the property as if the true owner," Washington courts have held that "[t]he 'ultimate test' of adverse possession is whether the party claiming adverse possession exercised dominion over the land in a manner consistent with actions a true owner would take." *LeBleu v. Aalgaard*, 193 Wn. App. 66, 82-83, 371 P.3d 76 (2016) (quoting *ITT Rayonier*, 112 Wn.2d at 759).

Adverse possession is a question of law, and we review de novo whether the findings of fact establish the elements of adverse possession. *Happy Bunch, LLC v. Grandview N., LLC*, 142 Wn. App. 81, 88, 173 P.3d 959 (2007).

B.      Hostility

The Orvolds advance several theories to support their assertion that the trial court erred by finding the Martins' use of the parking strip was hostile. The Orvolds argue that the Martins' "use of the [gravel parking strip] was consistent with and authorized by the [e]asement." Br. of Appellant at 13 (bold type omitted). Alternatively, the Orvolds argue that a presumption of neighborly acquiescence should apply and the Martins' use was not hostile under that presumption. And even if the presumption of neighborly acquiescence does not apply, the Orvolds contend that two prior owners of their property gave the Martins permission to use the gravel parking strip. We disagree.

1.      Background on hostility

The hostility element requires that "'the claimant treat the land as [their] own as against the world, throughout the [10-year] period.'" *Ofuasia v. Smurr*, 198 Wn. App. 133, 144, 392 P.3d 1148 (2017) (internal quotation marks omitted) (quoting *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 50, 271 P.3d 973 (2012)). The adverse claimant bears the burden of proving hostility. *Happy Bunch*, 142 Wn. App. at 89. Permission from the true owner, express or implied, negates the hostility element because permissive use is inconsistent with using the property as a true owner. *Teel*, 155 Wn. App. at 394.

It is not entirely clear whether a presumption of permissive use applies in adverse possession cases. In *Nickell*, we declined to apply the presumption of permissive use to an adverse possession claim, noting that although it is applicable to prescriptive easement claims, "the law disfavors prescriptive easements," but "no such disfavor applies to adverse possession of actual land." 167 Wn. App. at 51-52. Similarly, in *Kunkel v. Fisher*, Division One discussed this

13

distinction between prescriptive easements and adverse possession and suggested that the presumption of permission does not apply in adverse possession cases. 106 Wn. App. 599, 602-03, 23 P.3d 1128 (2001). In contrast, in *Herrin v. O'Hern*, Division One applied a presumption of permissive use in an adverse possession case, where the claimant's use of disputed land was "permissive at its inception" and the parties had a "friendly and familial relationship." 168 Wn. App. 305, 312, 275 P.3d 1231 (2012).

If the presumption of permissive use applies, an adverse claimant may defeat the presumption by showing that they somehow interfered with the owner's use of the land. *Gamboa v. Clark*, 183 Wn.2d 38, 52, 348 P.3d 1214 (2015). Here, even if the presumption were to apply, the Martins overcame it.

2.      Effect of the easement

The Orvolds claim that the Martins' use of the parking area was permitted by the easement, did not obstruct its use, and thus the Martins could not have established the element of hostility.

A 1990 road maintenance agreement for the neighborhood states that owners and their invitees were entitled to use the street for ingress and egress. Residents of the cul-de-sac regularly used the unpaved shoulder of the easement road for parking. However, the easement and road maintenance agreement did not permit altering the land covered by the easement area or controlling the use of the area by others. The Martins did not simply use the area for occasional parking; rather, the Martins created the parking area by carving into the hillside, landscaping the hillside, and regularly graveling the ground of the parking area they created. The Martins and their guests used the area parking at least 90 percent of the time, thereby limiting opportunities for anyone else to use it. And substantial evidence supported the trial court's finding that the Martins treated the land

as their own by giving permission for others to use it and occasionally asking third parties not to park there. Because the Martins "exercised dominion" over the parking strip and used the easement area in ways that exceeded the uses permitted by the easement and they took actions consistent with ownership, the existence of the easement did not prevent adverse possession of the gravel parking area. *LeBleu*, 193 Wn. App. at 82.

We hold that the Martins' treatment of the disputed area far exceeded the expressly permitted uses of the easement under the road maintenance agreement and the Martins' use of the gravel parking strip was not rendered permissive by the terms of the easement.

3.  Permission from prior owners

The Orvolds suggest that prior owners of their property gave the Martins permission to use the disputed area. We reject this contention because the trial court made undisputed findings to the contrary. The trial court found that the Martins did not seek or receive permission from any prior owners of the Orvold property to cut into the hillside, create a parking space, gravel and maintain it, or park there. The Martins fail to assign error to these findings, and undisputed findings are verities on appeal. *Robel*, 148 Wn.2d at 42.

4.  The Martins' use was hostile

The Martins' use was hostile because they treated the gravel parking strip as their own such that any reasonable person would have thought they owned it and because the Martins' use substantially interfered with the ability of any other neighbor to use the area from 1992 to 2015.

The Martins altered the land by excavating the hillside to create the gravel parking strip, exercising dominion over the property to the exclusion of others. The Martins "'treat[ed] the land as [their] own as against the world throughout the statutory period,'" thereby satisfying the

15

requirement of hostility. *Lingvall v. Bartmess*, 97 Wn. App. 245, 254, 982 P.2d 690 (1999) (quoting *Chaplin v. Sanders*, 100 Wn.2d 853, 860-61, 676 P.2d 431 (1984)). The trial court found that the Martins excavated the parking strip by cutting into the hillside and maintaining it, parked their own cars there regularly from 1992 to 2015, allowed family and friends to park, excluded others, and maintained the landscaping of the area. The Martins sometimes allowed others to park as a neighborly accommodation, did not use the parking strip every day, and did not create a physical barrier or put up a sign restricting use of the parking area, but these facts do not negate that the Martins' use of the land, viewed objectively, was consistent with ownership. *See id.* (adverse possessors need not take every conceivable step an owner would take in order to establish hostility).

To the extent the Orvolds cite prescriptive easement cases to support their argument that the Martins failed to establish hostility, these cases are inapplicable. Prescriptive easements are disfavored while adverse possession is not. *See Nickell*, 167 Wn. App. at 52; *see also Kunkel*, 106 Wn. App. at 602. Moreover, even if the presumption of permission were to apply here, the Martins still established that their use of the disputed area was hostile. They interfered with the title owners' use of the land by carving the parking strip out of the hillside, landscaping above it, and by otherwise acting as if they owned the parking strip. The Martins have established the hostility element.

C.     Open and Notorious Use

The Orvolds argue that the trial court erred by finding that the Martins' use was open and notorious because Pulicicchio told the Martins that he owned the parking strip land and the

16

Martins' maintenance was limited to re-graveling the space a few times over the 27-year period, which did not constitute "open and notorious use." Br. of Appellant at 20-21. We disagree.

To establish open and notorious use, an adverse possession claimant must show use consistent with ownership, considering the land's nature and location. *Acord v. Pettit*, 174 Wn. App. 95, 104, 302 P.3d 1265 (2013). This requires showing either that the title owner had actual notice of the adverse use throughout the 10-year period or that the claimant used the land such that any reasonable person would have thought they owned it. *Ofuasia*, 198 Wn. App. at 143-44.

In undisputed factual findings, the trial court found that the Martins "excavated and flattened" a portion of the hillside, landscaped it, and maintained it "by pulling weeds out of the ivy, trimming the ivy, and adding gravel as needed." CP at 1004. The Martins used the parking strip at least 90 percent of the time, "compared to the rest of the world" between 1992 and 2015. CP at 1006. These findings of fact supported a conclusion that the Martins used the parking strip in a manner that would lead any reasonable person to think they owned it. *See Ofuasia*, 198 Wn. App. at 143-44. The Martins met their burden of establishing that their use was open and notorious.

The Orvolds do not contest the remaining elements of adverse possession. We hold that the Martins established adverse possession over the gravel parking strip.

III. MUTUAL RESTRAINING ORDERS

The Orvolds argue that the trial court abused its discretion by ordering both parties to disable any audio recording functions of their security systems and make any security lights on their properties motion activated. The Martins do not cross appeal the entry of the injunction against them. The trial court did not abuse its discretion by entering these orders.

17

A trial court has "broad discretionary power to shape and fashion injunctive relief to fit the particular facts, circumstances, and equities of the case before it." *Brown v. Voss*, 105 Wn.2d 366, 372, 715 P.2d 514 (1986) (emphasis omitted). A court's powers of equity include the ability "'to grant such ancillary or incidental relief as will be necessary to make the relief sought complete.'" *Residential Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 447, 327 P.3d 600 (2013) (quoting *Dare v. Mt. Vernon Inv. Co.*, 121 Wash. 117, 120, 208 P. 609 (1922)). We review a trial court's injunction for abuse of discretion. *Id.* at 446.

Here, the trial court ordered that "[i]f either party's security system allows for audio recording of any type, the audio recording feature shall be disabled immediately unless the party has obtained written consent of the person being recorded, as required by Washington's Privacy Act." CP at 1055. The trial court also restrained the parties "from shining flood lights into each other's windows," requiring that "any security lighting shall be motion-sensitive only and shall be pointed at the party's own property, not at or across the street." *Id.*

The trial court did not abuse its discretion. Mark's undisputed testimony supported the trial court's finding that the audio recording function of the Orvolds' security system had recorded conversations in the Martins' driveway. Both Debra and a neighbor who testified for the Martins explained that the Orvolds' floodlights were no longer on motion sensors, they were bright, and they shined into others' homes and were disruptive. The trial court also found, and the Orvolds did not challenge, that both parties failed to abide by the court order prohibiting them from filming and photographing each other.

The trial court intended to keep the parties from continuing to bother each other while also deescalating neighborhood tensions and preventing Corey from losing her security clearance.

Given the trial court's broad discretion to fashion fact-specific injunctive relief, the trial court properly fashioned an equitable remedy by entering an order designed to deescalate conflict between the parties and in the neighborhood and afford complete relief. *See Hough v. Stockbridge*, 150 Wn.2d 234, 236, 76 P.3d (2003); *Brown*, 105 Wn.2d at 372; *Resident Action Council*, 177 Wn.2d at 445, 447; *State v. Noah*, 103 Wn. App. 29, 43, 9 P.3d 858 (2000); RCW 10.14.080(6)(b).

The trial court did not abuse its discretion by ordering the Orvolds to turn off the audio recording functions of their home security system and use only motion-sensitive flood lighting directed at their own property.

## IV. ATTORNEY FEES

### A.    Attorney Fees Below

The Orvolds argue that because the trial court entered protection orders against both parties, the court erred by awarding the Martins attorney fees for their protection order without also awarding attorney fees to the Orvolds for the fees they incurred in pursuing their own protection order or offsetting the Martins' attorney fees award by the amount the Orvolds spent on their protective order. When the Orvolds made this argument to the trial court, the court concluded that the work the Martins' attorney did on the adverse possession issue could not be segregated from the work performed to pursue a restraining order against the Orvolds. We affirm the trial court's ruling.

RCW 7.28.083(3) establishes a statutory basis for awarding attorney fees to the prevailing party in an adverse possession action if "the court determines such an award is equitable and just." The Orvolds argue that the trial court erred by failing to segregate attorney fees related to the adverse possession action from attorney fees related to the restraining orders.

We review a trial court's fee segregation decision for abuse of discretion. *King County v. Vinci Constr. Grands Projects/Parsons RCI/Frontier-Kemper, JV*, 188 Wn.2d 618, 632, 398 P.3d 1093 (2017). The trial court abuses its discretion when its decision is manifestly unreasonable or its reasons untenable. *Id.* "[W]here 'the plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories,' a lawsuit cannot be 'viewed as a series of discrete claims' and, thus, the claims should not be segregated in determining an award of fees." *Fiore v. PPG Indus., Inc.*, 169 Wn. App. 325, 352, 279 P.3d 972 (2012) (some alterations in original) (internal quotation marks omitted) (quoting *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 672-73, 989 P.2d 1111 (1999)).

Here, the trial court determined that "the Martins were the prevailing party as far as injunctive relief is concerned." 6 VRP at 715. The trial court did not believe the claims presented during the trial could be segregated for attorney fees purposes because of the "incredibly fact specific" nature of adverse possession cases. *Id.* at 714. The Martins received the restraining order they requested, so in that sense they prevailed on their claim seeking injunctive relief. Moreover, the adverse possession claims and protection order claims relied on the same common core of facts about the dispute over the gravel parking space, the protection order claims were litigated in the same proceeding as the adverse possession claim, and evidence for both claims was often elicited from the same witnesses. The trial court's decision not to segregate attorney fees in these circumstances was not manifestly unreasonable.

B.    Attorney Fees on Appeal

Both parties request attorney fees on appeal. Because we affirm that the Martins are the prevailing party, we deny the Orvolds' request.

No. 53831-8-II

The Martins request attorney fees on appeal under RAP 18.1 and RCW 7.28.083(3). "Attorney fees may be awarded at the appellate level only when authorized by a contract, a statute, or a recognized ground of equity." *Workman v. Klinkenberg*, 6 Wn. App. 2d 291, 308, 430 P.3d 716 (2018). As it did below, RCW 7.28.083 provides a statutory basis for awarding fees on appeal. It is equitable and just to award attorney fees to the Martins because they have successfully defended this appeal. This court's commissioner will determine the amount to be awarded. Any arguments about segregation of attorney fees at this level may be resolved by the commissioner.

CONCLUSION

We affirm and grant the Martins' request for attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Maxa, P.J.

Cruser, J.

21